## The People v. Marshall G. Barker and William K. Barker.

*Criminal Law—Jury—Disqualifying opinion defined—Is one repelling presumption of innocence—" Some evidence to remove," defined—Sources of information important— Question one of degree—Challenge to the favor —Respondent not prejudiced by overruling if he accepts jury before exhausting his peremptory challenges—Circuit judge—Discretion in selection of jury—Should see that proper and competent men are selected— Juror failing to appear at adjourned hour and found an hour afterwards, playing pool, properly excluded from panel—Alien—Disqualified to sit on jury—Non-citizenship discovered after jury is sworn—May be discharged by the court—Respondent not in jeopardy until jury of twelve competent men are sworn— Confessions—Prima facie, competent evidence —Burden of proof ordinarily on respondent to repel presumption— Province of court to decide as to competency, when question free from doubt—If testimony is conflicting, jury should decide—Cross-examination.*

1. The opinion which disqualifies a juror from sitting in a criminal case, is of that *fixed* character which repels the legal presumption of the innocence of the accused, who is already condemned in the juror's mind; and such disqualification does not arise because it will require *some evidence* to remove impressions, or opinions formed from rumors, newspaper statements, or from whatever other sources these impressions may have been received.

2. The sources of such information are important in determining the effect likely to have been produced upon the mind of the juror, and the influence likely to be exerted upon his judgment; but the human mind is so constituted that impressions made upon it which lead to certain conclusions, whether reached or not, will always require other impressions to be made to eradicate the former ones, or to lead to different conclusions; in other words, *some evidence* is required to remove them.

3. In such a case the question, therefore, must be always one of degree, and the trier is called upon to determine whether the opinion entertained is of that *fixed* or *permanent* character which disqualifies the juror from coming to the case in a fair, candid, and impartial frame of mind, which is unaffected with prejudice or favor to either party. (*Holt v. People*, 13 Mich. 228; *Stephens v. People*, 38 Id. 739; *Ulrich v. People*, 39 Id. 245.)

4. Where a challenge to the favor was improperly overruled, and the

juror thereupon peremptorily challenged by the respondent, who accepted the jury without exhausting his peremptory challenges:

*Held,* that he was not injured or in any manner prejudiced by being obliged to thus challenge the objectionable juror. (*Sullings v. Shakespeare,* 46 Mich. 408.)

5. During the impaneling of a jury in a criminal case, and before a full panel had been secured, an adjournment was had until the following morning; upon the opening of court at the appointed hour, a juror who had been accepted as one of the panel prior to such adjournment failed to appear, and after an hour's search was found in a room of a hotel, playing pool. The court excused him from the panel, his place being filled by another juror, to which order the respondents excepted.

*Held,* that a circuit judge is invested with a certain degree of discretion in the selection of a jury, which should be exercised by seeing that *proper* and *competent* men are selected; and so long as the case of the respondent is not prejudiced by the exercise of such discretion, he cannot complain.

*Held,* further, that in the case cited the juror had exhibited such reckless disregard of his duty as to make it quite evident that he was unfit to serve, and the judge was guilty of no impropriety in excluding him from the panel.

6. After a jury had been selected and sworn, and before any further proceedings were had in the case, it was ascertained that one of the panel was an alien. The court thereupon ordered him to stand aside, and be discharged from the panel, and that another juror be drawn in his stead, and that the respondents be allowed to challenge the remaining eleven, either for cause or peremptorily, if they desired to do so; to which order the respondents excepted. Thereupon another juror was drawn and selected, the jury sworn, and the trial proceeded.

*Held,* that the action of the court was correct, and supported both by reason and authority.

*Held,* further, that an alien is not qualified in any respect to sit upon a jury in this State; that the jury when first sworn consisted of only eleven jurors, and that the respondents were not in jeopardy until a jury of twelve *competent* men were selected and sworn.

7. Where exception is not taken to an alleged illegal ruling by the court, error is not properly assigned thereon.

8. Proof was offered by the prosecution in a criminal case of alleged confessions of guilt made by the respondent, who objected upon the ground that such confessions were secured in consequence of offers of favor made to him by the officer who made the arrest, and then had respondent in custody. The court thereupon gave respondent's counsel permission to examine the witness fully, before answering any questions, to ascertain what influence, if any, surrounded respond-

ent at the time he talked with the witness; which offer was not accepted, and the testimony was received.

*Held,* that for all that appeared to the court at the time the testimony was offered, it was prima facie competent, and in the absence of respondent's objection no preliminary examination into the facts and circumstances was called for; but that, on such objection being made, it became the duty of the presiding judge to determine the issue raised, upon hearing all competent evidence upon it tendered by either party; that in the absence of *all* evidence a confession is presumed to have been voluntarily made, and when the party confessing alleges the contrary, he is called upon to at least rebut such presumption.

**9.** After the introduction of the evidence relative to such confession, it appeared that a prior confession had been secured from respondent by means of such fraud and artifice as rendered proof of the same incompetent.

*Held,* that had these facts appeared prior to the introduction of such evidence, it would have been incumbent on the prosecution to prove that the confession offered was not the result of the said illegal influence.

*Held,* further, that where a subsequent confession is made, and objected to on the ground that the party making it was under the influence of the inducement held out or exercised to obtain the previous confession, which for that reason is not admissible in evidence, the question raised is one for the jury, under proper instructions from the court. (*Com. v. Cullen,* 111 Mass. 435; *Com. v. Smith,* 119 Mass. 305; *Com. v. Piper,* 120 Mass. 185; *State v. Potter,* 18 Conn. 166; *Com. v. Taylor,* 5 Cush. 605.)

**10.** In a case free from doubt, it is the province of the court to determine whether a confession was voluntarily made or not before admitting or rejecting the same as evidence; but in case of conflict of testimony, or room for doubt, the court should submit the question to the jury, with instructions that if they are satisfied that inducements were used they shall disregard and reject the confession.

**11.** Where a witness is sworn and gives some evidence, however formal, he is to be considered a witness for all purposes, and is subject to cross-examination upon all matters material to the issue. (2 Phil. Ev. § 898; *Morgan v. Brydges,* 2 Starkie, 314; *Wentworth v. Crawford,* 11 Tex. 127; *Beal v. Nichols,* 2 Gray, 264; *Chandler v. Allison,* 10 Mich. 461; *Thompson v. Richards,* 14 Mich. 172; *Railroad Co. v. Van Steinburg,* 17 Mich. 99; *O'Donnell v. Segar,* 25 Mich. 367; *Wilson v. Wagar,* 26 Mich. 452; *Haynes v. Ledyard,* 33 Mich. 319; *Jacobson v. Metzger,* 35 Mich. 103; *Lichtenberg v. Mair,* 43 Mich. 387; *Driscoll v. People,* 47 Mich. 413; *Stearns v. Vincent,* 50 Mich. 221; *People v. Murray,* 52 Mich. 288; *Joslin v. Grand Rapids Ice Co.* 53 Mich. 322; *Dalman v. Koning,* 54 Mich. 320; *People v. Hare,* 57 Mich. 505; *Petrie v. Lane,* 58 Mich. 529.)

Error to Van Buren. (Mills, J.) Argued January 28 1886. Decided April 8, 1886.

Information for murder. Convicted. Affirmed. The facts are stated in the opinions.

*Benj. F. Heckert*, for respondents :

The examination made by Dr. Andrews was insufficient to base an opinion on as to the cause of death. He stated no facts on which to base it, but does show that he had no knowledge on the subject. His opinion was a mere guess : *Grand Rapids & Ind. R. R. Co. v. Huntley*, 38 Mich. 542–3.

The fact that deceased was not drowned, in no way tended to establish strangulation or a felonious homicide, and if it did, it in no way connected the respondents with the crime. It did not tend to prove the *corpus delicti*, and, if proper at any stage of the trial, was incompetent until after the *corpus delicti* had been established : *People v. Hall*, 48 Mich. 484–5 ; *People v. Millard*, 53 Mich. 67–8.

The means resorted to by the officers, and the course pursued by the detectives with their aid, full consent, and approval, to convict respondents, present the most extraordinary and unfair spectacle in the annals of criminal procedure, wholly unwarranted by the law. This Court has condemned in severe terms the practice of either deceiving, cajoling, or frightening persons into making confessions while in the power of the law : *Flagg v. People*, 40 Mich. 706 ; *People v. Wolcott*, 51 Mich. 614 ; and see, also, 1 Greenleaf on Ev. §§ 219, 220.

Under the evidence, the burden was on the People to show that respondents, at time of making the admissions received in evidence, were no longer acting under the influence of the promises made to secure the prior confessions which the court excluded : Wharton's Crim. Ev. § 677, notes 3, 10 ; *Keith v. Lothrop*, 10 Cush. 453 ; 1 Greenleaf Ev. § 219 ; *State v. Guild*, 5 Halstead (N. J.) 163.

The hand-writing should have been proved before the exhibits were admitted in evidence : *Van Sickle v. People*, 29 Mich. 64–5 ; *People v. Cline*, 44 Mich. 294–5 ; Wharton's Crim. Ev. §§ 550–1.

*S. D. Clay* and *E. S. Eggleston*, for respondents :

No hypothetical question can be properly put to an expert,

until evidence tending to prove the facts upon which the question is based has been introduced : *People v. Millard,* 53 Mich. 63.

As to duty of court to see that the influence by means of which the excluded confessions were obtained had entirely passed away before admitting proof of the subsequent ones, counsel cited : *Flagg v. People,* 40 Mich. 706 ; *People v. Wolcott,* 51 Mich. 612.

[The briefs of counsel for respondents are mainly devoted to an elaborate discussion of the evidence and objections, without further citation of authorities.—REPORTER.]

### *Moses Taggart,* Attorney General, for People:

The mere statement of a juror that he has formed an opinion does not disqualify him : *Holt v. People,* 13 Mich. 224 ; *Ulrich v. People,* 39 Mich. 248 ; *Moses v. State,* 10 Humph. (Tenn.) 458 ; *O'Mara v. Com.,* 75 Penn. St. 424, and the burden is on the challenging party : *Holt v. People* (above cited).

The belief that a crime has been committed by *some one* is not ground of challenge for cause : *Stewart v. People,* 23 Mich. 63 ; *Cargen v. People,* 39 Mich. 551.

The jurors complained of were excused without exhausting respondents' peremptory challenges, who were satisfied with the panel finally selected, hence were not prejudiced : *Sullings v. Shakespeare,* 46 Mich. 408.

The opinion of the witness Dr. Andrews that deceased was not drowned, but dead before being put into the water, was competent. The witness was not allowed to state the cause of death : *People v. Hare,* 57 Mich. 505. The doctor was an intelligent witness, and had clearly described the appearance of the body : Lawson on Expert and Opinion Ev. 221; *Everett v. State,* 62 Ga. 65.

The question put to Dr. Hathaway, "suppose that death occurred from strangulation, and the eyes and tongue protruded, and the body thrown into the water, would the eyes and tongue remain in the same condition or would they protrude further?" was competent, it being certified by the court that such evidence had been offered by the People. As re-direct upon the cross and re-cross examination the question was competent, and as showing the nature of the changes, if any, after death, the testimony was proper : *State v. Vincent,* 24 Iowa, 577; *O'Mara & Irving v. Com.* 75 Penn. St. 424; *People v. Hare,* 57 Mich. 505. The testimony as to respondents' admissions was prima facie competent : *People v. Rogers,*

18 N. Y. 9; *Com. v. Mosler*, 4 Penn. St. 264; *Reg. v. Garner*, 2 C. & K. 920; Roscoe Crim. Ev. 40, 55; 1 Wharton's Ev. § 392.

The statement of respondents here proven was purely voluntary, and not connected with any promises made, and was without the rule contended for by the defense: Roscoe Crim. Ev. 39; *State v. Potter*, 18 Conn. 166; *Rex v. Richards*, 5 C. & P. 318; *Rex v. Howes*, 6 C. & P. 404; *Com. v. Cuffee*, 108 Mass. 285; *State v. Patterson*, 68 N. C. 292.

To render confessions incompetent, they must have been made to, or in the presence of, some one in authority, and induced by threats or promises of such party: *Rex v. Gibbons*, 1 Carr. & P. 97; *Milligan v. Welchman's Case*, 6 C. H. Rec. p. 69; Arch. Cr. Pr. & Pl. Vol. 1, marg. p. 129, note; Roscoe Crim. Ev. 41; and the question has been said to be, whether the inducement held out was calculated to make the confession an untrue one: *People v. Smith*, 3 How. P. 229; *Rex v. Ct.* 7 C. & P. 486; and it was held that where a confession was obtained by artifice, and made voluntarily, that the weight to be attached to it was for the jury: *Murphy v. People*, 63 N. Y. 591; *Com. v. Piper*, 120 Mass. 186; *Com. v. Tuckerman*, 10 Gray, 190; *Com. v. Knapp*, 9 Pick. 496; *Stage's Case*, 5 City Hall Rec. 177; *Rex v. Richards*, 5 C. & P. 318; *Rex v. Gibbons*, 1 C. & P. 97; *Rex v. Derrington*, 2 C. & P. 418; *Rex v. Shaw*, 6 C. & P. 373; *Rex v. Thomas*, 7 C. & P. 345; *State v. Vaigneur*, 5 Richardson (S. C.) 391; *State v. Motley*, 7 Id. 327; *State v. Aaron*, 1 Southard (N. J.) 235; *State v. Jenkins*, 2 Tyler (Vt.) 377; *Jefferds v. State*, 5 Park. Crim. R. N. Y. 522; *Com. v. Dillon*, 4 Dall. 116.

The letters offered in evidence were admissible without regard to the manner in which they were obtained: Arch. Cr. Pr. and Pl. 128; *Rex v. Darrington*, 2 C. & P. 418; Roscoe Cr. Ev. 47; *Rex v. Shaw*, 6 C. & P. 373; *Rex v. Thomas*, 7 C. & P. 345; *State v. Garrett*, 71 N. C. 85.

If counsel cross-examines a witness as to facts not admissible in evidence, the other party has a right to re-examine as to the evidence given: Greenleaf Ev. § 468; and the rule is the same if on direct examination he offers improper testimony. See, also, *Chandler v. Allison*, 10 Mich. 461; *Thompson v. Richards*, 14 Mich. 173; *N. Y. Iron Mine v. Negaunee Bank*, 39 Mich. 658; *People v. Hare*, 57 Mich. 505.

So much of confessions, however obtained, as relates directly to facts established, and as may aid in establishing facts, is admissible: *State v. Vaigneur*, 5 Richardson, S.

C. 391; *State v. Crank*, 2 Bailey, S. C. 66; *Duffy v. People*, 26 N. Y. 588; *Com. v. Knapp*, 9 Pick. 511; 1 Phillips Ev. (5 ed.) marg. p. 554–5; *State v. Motley*, 7 Rich. S. C. 327; *Milligan v. Welchman's Case*, 6 C. H. Rec. 69, 78; *State v. Aaron*, 1 South. 235; Arch. Cr. Pr. and Pl. Vol. 1 p. 131, (marg. p.); *Stage's Case*, 5 C. H. Rec. 177.

Where the testimony is conflicting whether the confessions made were obtained by threats and promises, there is authority for submitting the question of fact as to whether they were voluntary or otherwise, to a jury: *State v. Jenkins*, 2 Tyler, 377; *State v. Guild*, 5 Halstead, 163, 179; *Jefferds v. State*, 5 Park. Crim. L. R. (N. Y.) 522; *Com. v. Piper*, 120 Mass. 186; *Com. v. Dillon*, 4 Dall. 116; and where a confession was made subsequent to an extorted one, held a question for jury to determine whether the prior induced the latter: *Stage's Case*, 5 C. H. Rec. 178.

*Lester A. Tabor*, of counsel, for people:

The party alleging error must establish it by the record: *Kline v. Kline*, 49 Mich. 419; and it must be affirmatively shown: *Brown v. Haak*, 48 Mich. 229; and presumptions always support judicial proceedings: *Lymburner v. Jenkinson*, 50 Mich. 488; and the appellant's record is presumed to be as favorable to him as he is entitled to have it as to facts so essential that they cannot be overlooked: *Hamilton v. Langley*, 52 Mich. 549.

An opinion formed by one called as a juror, not strong enough to lead him to prejudice the case, or likely to prevent a candid judgment on hearing the evidence, does not disqualify: *Com. v. Webster*, 5 Cush. 295; *State v. Potter*, 18 Conn. 166; *Reynolds v. U. S.*, 98 U. S. 145; *State v. Williams*, 3 Stewart (Ala.) 454; Brown's Case, 2 Leigh, 769; *Sprouce v. Com.* 2 Va. Cases, 375; *Curley v. Com.*, 84 Penn. St. 151.

Before a juror is sworn in a case, the judge may excuse him for any reason personal to the juror which seems to the judge sufficient: *People v. Carrier*, 46 Mich. 442–4; *Atlas Mining Co. v. Johnston*, 23 Mich. 36.

Alienage is a total disqualification to be a juror: *Hill v. People*, 16 Mich. 351. If after a trial has commenced it is found that a juryman has not been sufficiently sworn, or to be insane, he may be discharged, and a new juror drawn in his place: *U. S. v. Haskell*, 4 Wash. C. C. R. 402; *U. S. v. Morris*, 1 Cur. C. C. R. 23.

A jury must consist of twelve men who are *competent* to

serve as jurymen: *Work v. State,* 2 Ohio (N. S.) 296; *Cancemi v. People,* 18 N. Y. 128; *Brown v. State,* 8 Blackford, 561; 2 Leading Crim. Cases, 337; *Hill v. People,* 16 Mich. 351; but this precise question has lately been passed upon in Illinois: *Stone v. People,* 2 Scam. (Ill.) 326.

A respondent is not put in jeopardy by the impaneling of a jury of eleven, and if in such a case the cause proceeds to verdict, it is a mistrial: *Hill v. People,* 16 Mich. 351, *Brown v. State,* 8 Blackford, 561; *State v. Allen,* 46 Conn. 531; and the court is not bound to suffer a case to proceed after a jury is impaneled when advised of a fact which disqualifies a juror, rendering it probable that a verdict would be set aside: *Mitchell v. State,* 43 Texas, 512–16; Wormeley's Case, 10 Gratt. 658; *Muirhead v. Evans,* 6 Exch. 447.

In the last case cited it was discovered during the examination of the first witness that there were thirteen jurors in the box, and it was impossible to discover which one was last sworn. Twelve were re-sworn, and the trial proceeded; and this practice was held correct. See upon this point: *Davis v. State,* 9 Texas App. 634; *Bullard v. State,* 38 Texas, 504; *State v. Reeves,* 11 Louisiana An. 685; *Robinson v. State,* 33 Ark. 180; *State v. Vestal,* 82 N. C. 563; *State v. Vann,* Id. 631; *Nolen v. State,* 2 Head. 520; *Hines v. State,* 8 Humph. 597; *State v. Cunningham,* 72 N. C. 469; *Pannell v. State,* 29 Ga. 681; *Isaac v. State,* 2 Head. 458; *Lewis v. State,* 3 Head. 127; *People v. Daman,* 13 Wend. 351; *Lewis v. State,* 9 Smed. and M. 115; *McGuire v. State,* 37 Miss. 369; *Tooel v. Com.,* 11 Leigh. 714; *Smith v. State,* 55 Miss. 513; *State v. Adair,* 66 N. C. 298; *Com. v. Twombly,* 10 Pick. 480, note; *State v. Davis,* 80 N. C. 412; and see Thompson and Merriam on Juries, p. 301.

As to the admissibility of the testimony of the medical witnesses, see *People v. Hall,* 48 Mich. 482; *People v. Hare,* 57 Mich. 505; *State v. Smith,* 32 Maine, 369; *Cook v. State,* 4 Zab. 843, 852.

Legally speaking, there is no such thing as an objection to evidence on account of "incompetency." This expression has always been applied to witnesses and not to evidence: 1 Greenleaf Ev. §§ 327, 340.

It is a general rule that when a witness is questioned in relation to a matter, the opposite party has a right to call out on cross-examination all that was said at the time: *Lichtenberg v. Mair,* 43 Mich. 387, and cases cited.

CHAMPLIN, J. The respondents were informed against for

murder, and were convicted of murder in the second degree. Marshall G. Barker was sentenced to imprisonment for life, and William K. Barker for the term of twenty-five years.

There are forty-nine assignments of error, which may be considered under three heads, namely : Those relating to the selection of the jury ; those relating to the introduction of expert testimony ; and those relating to the alleged confessions of respondents.

1. The respondents claimed the right to challenge peremptorily sixty jurors, which was acceded to by the court. The qualification of the jurors challenged was tried and determined in open court by the circuit judge, who rejected some who were challenged for cause, and accepted others.

It is claimed by the counsel for respondents that the circuit judge erred in accepting certain jurors who were challenged for cause of bias, or of entertaining opinions relative to the guilt or innocence of the respondents which would require evidence to remove. The constitution of this State provides that, " in every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury :" Article 6, § 28.

It was said in *Holt v. People*, 13 Mich. 228 :

"To require that jurors shall come to the investigation of criminal charges with minds entirely unimpressed by what they may have heard in regard to them, or entirely without information concerning them, would be, in many cases, to exclude every man from the panel who was fit to sit as a juror. With the present means of information, the facts or rumors concerning an atrocious crime are, in a very few hours, or days at farthest, spread before every man of reading and intelligence within the district from which jurors are to be drawn, and over the whole country, if the atrocity be especially great. And there are some crimes so great and striking that even the most ignorant will have information and impressions in regard to them ; and the rule as stated, applied to such cases, would render the impaneling of a jury for their trial impossible, and make their very enormity a complete protection from punishment.

Without attempting or endeavoring to lay down rules for all cases, it is sufficient for us to say that the showing in the present case falls far short of establishing cause for challenge.

The juror is shown to have formed a partial opinion, but not a positive opinion. This opinion was not based upon anything which he had himself witnessed, or from information derived from those who claimed to know the facts, but upon street rumors. Now, when a person says that he has formed, from street rumors, a partial, but not a positive opinion, we think he is to be understood as speaking only of those impressions which every one receives insensibly when a charge of crime is made, but which, so far from amounting to settled conviction, do not in the least preclude an impartial examination of the facts, when afterwards presented in the form of legal testimony."

This case was cited with approval in *Stephens v. People*, 38 Mich. 739. The opinion in this case was written by the same learned judge who wrote the opinion in *Holt v. People*, and in this case he said:

"The question on this record is, whether that jury can be an impartial one whose members are already so impressed with the guilt of the accused that evidence would be required to overcome such impressions. It seems to us that this question needs only to be stated: it calls for no discussion. This woman, instead of entering upon her trial supported by a presumption of innocence, was, in the minds of the jury when they were impaneled, condemned already; and by their own statements under oath it is manifest that this condemnation would stand against her until removed by evidence. Under such circumstances it is idle to inquire of jurors whether or not they can return just and impartial verdicts; the more clear and positive were their previous impressions of guilt, the more certain may they be that they can act impartially in condemning the guilty party. They go into the jury-box in a state of mind that is well calculated to give a color of guilt to all the evidence; and if the accused escapes conviction, it will not be because the evidence has established guilt beyond a reasonable doubt, but because an accused party, condemned in advance, and called upon to exculpate himself before a prejudiced tribunal, has succeeded in doing so."

The subject came under review again in *Ulrich v. People*, 39 Mich. 246, and the court said:

"That it appeared that one of the jurors had formed and retained an opinion which evidence would be required to

remove. It appeared, upon examination of this juror, that he had read a little about the case,—in all about twenty lines; that from this he had formed an opinion, not of a fixed character, but which would require evidence to remove; and he believed that he would be able to render an impartial verdict according to the evidence submitted upon the trial. What the opinion was, whether favorable or unfavorable to the accused, did not appear. The showing as to the incompetency of this juror was insufficient. The opinion he had formed was not based upon anything he had himself witnessed, or from information derived from any one who claimed to know the facts, but from reading a few lines in a newspaper, which could not have given a very full account of the transaction, or made a very deep or lasting impression upon his mind, or one that would preclude him from an impartial examination of the facts as presented during the trial."

From what has been said by this Court in the cases cited, it appears that the opinion entertained by a juror which disqualifies him is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already. It is not because it will require some evidence to remove impressions, or opinions formed from rumors, newspaper statements, or from whatever other sources these impressions may have been received, that a juror is disqualified. The sources of information are important in determining the effect likely to have been produced upon the mind of the juror, and the influence likely to be exerted upon his judgment; but the human mind is so constituted that impressions made upon it which lead towards certain conclusions, whether reached or not, will always require other impressions to be made to eradicate the former ones, or to lead towards different conclusions;—in other words, will require some evidence to remove them. We all are conscious that notions entertained by us are not all of the same stable character, and range all the way from conviction, which is the ultimate effect of ratiocination, to the passing comment or idle words that leave no permanent impression.

The question, therefore, must be always one of degree

and the trier is called upon to determine whether the opinion entertained by the juror is of that fixed or permanent character which disqualifies him from coming to the case in a fair, candid, and impartial frame of mind, which is unaffected with prejudice or favor to either party.

Each of the jurors challenged stated, under oath, that from what they had read in the newspapers, and talk in the neighborhood, and rumors, they had formed opinions which would require evidence to remove, One said it would take good evidence—decided evidence. Two of them had formed their opinions from what they had read in the newspapers, purporting to be a confession made by the respondents, and that it would require evidence to change such opinions. It seems to me that the evidence shows that these jurors had such fixed opinions as disqualified them from sitting as jurors. The learned circuit judge thought otherwise, and overruled the challenges to the favor. They were, in each instance, challenged by the respondents peremptorily, and rejected. The question now is, were the respondents prejudiced by the rulings of the court? It appears from the record that after the jury were finally impaneled and sworn the respondents had twenty-two peremptory challenges remaining unused. It is not perceived how they were injured, or in any manner prejudiced, by being compelled to challenge these jurors peremptorily. If the law was that the respondent could exercise the right of peremptorily challenging jurors without limit, until he was satisfied with the jury, and the court should overrule his challenges for cause, and he should then reject the jurors peremptorily, no harm could possibly come to him by such erroneous ruling. Neither can it work harm where, in pursuing such course, his right of challenge is not exhausted before he secures a jury with whom he is satisfied to be tried. The point was directly ruled in *Sullings v. Shakespeare*, 46 Mich. 408.

During the progress of the cause, and before a full panel had been secured, a juror had been accepted as one of the panel, and the court adjourned at the close of one day until nine o'clock the next day. Upon assembling at the appointed

time, this juror did not appear. After a delay of nearly an hour, and search, he was found in a room of the hotel, playing pool. The court fined the juryman $10 for contempt of court for not being present when the court opened, and excused him from the panel, and ordered him to step aside. His place was afterwards filled by another juror. The respondents excepted to that part of the judge's order which excused the juror from serving.

The circuit judge is invested with a certain degree of discretion in the selection of jurors for a panel. Such discretion is to be exercised in seeing that proper and competent men are selected; and so long as the case of the parties is not prejudiced by the exercise of such discretion, they cannot complain.

In the case of *Atlas Min. Co. v. Johnston*, 23 Mich. 36, neither party objected to the jury as finally obtained, yet the court set aside two jurors without any challenge, because from their examination they did not seem to be entirely impartial; and it was said that,

"It would be ground of error for the court to admit a juror who is challenged and ought to have been rejected. It is no ground of error to be more cautious and strict in securing an impartial jury than the law actually required; and that for this purpose the court may very properly reject a juror on a ground which would not be strictly sufficient to sustain a challenge for cause, or, in other words, when the refusal to sustain the challenge would not constitute error."

In the case of *People v. Carrier*, 46 Mich. 442, a juror was excused by the judge for the reason that he was to be a witness in the next case to be tried, and this Court said:

"Before a juror has been sworn in the case, the judge may excuse him for any reason personal to the juror which seems to the judge sufficient."

In *Torrent v. Yager*, 52 Mich. 506, the judge excluded a juror against objection, and without challenge, because of his unfitness in consequence of the excessive use of intoxicating liquor while acting as a juror. This was held not to be error, the Court saying:

"It is the duty of the court to carefully guard and protect the rights of parties in the selection of jurymen, and see to it that no person who is incompetent is allowed to sit in the case."

In the case under consideration, the juror had exhibited such reckless disregard of his duty as a juror as to make it quite evident that he was unfit to serve upon the panel, and the judge was guilty of no impropriety in excluding him therefrom.

After the jury had been selected and sworn, and before any further proceedings were had in the case, it was ascertained that one of the members of the panel was an alien. The court thereupon ordered him to stand aside, and be discharged from the panel, and that another juror be drawn in his stead; and that the respondents be allowed to challenge the remaining eleven, either for cause or peremptorily, if they desired to do so. The respondents excepted. Another juror was drawn and selected, and the jury were sworn, and the case proceeded. An alien is not qualified in any respect to sit upon a jury in this State. The jury when sworn consisted of only eleven jurors. The respondents were not in jeopardy until a jury of twelve men should be selected and sworn. The action of the circuit judge was correct, and supported both by reason and authority, many of which are cited in the brief furnished us by the counsel for the People.

Error is also assigned upon what transpired during the selection of the jury, with reference to investigating the truth of a rumor that $1,000 had been put into the bank at Paw Paw, with which to bribe the jury. The matter was fully probed, and turned out to be entirely without foundation; and, while I do not approve the wisdom or propriety of the time and manner of the investigation, I do not see that the respondents could possibly be prejudiced in the minds of the jury by what transpired. It turned out to be a silly, idle rumor, without foundation, and without the semblance of testimony to support or give currency to it; and the result of the investigation was a complete vindication of the respondents from any charge of bribery, or attempted bribery,

or corruption, of jurors. Morever, no exceptions were taken by the respondents, and for that reason the errors are not properly assigned upon this record.

2. Dr. Josiah Andrews was a practicing physician and surgeon. He was present at the post mortem examination of the body which had been found in Max lake. He stated the examination which he made of the body, and described it as bloated considerably, and livid, purple, dark purple,— particularly the upper part of the body more than the lower part; made examination to ascertain cause of death, if he could do so, but did not make a very extended examination of the body from the fact that it was very decomposed, very offensive, and even dangerous, to work over; examined the lungs and heart in particular, found the lungs somewhat collapsed, not very much filled out with air. Both cavities of the heart were entirely empty of blood,—no blood in them,—nor in the first portion of the vessels,—the aorti and other large vessels. He described the appearance of other parts of the body, and the condition of the heart, and also the usual condition of the heart where death ensued from drowning. The prosecuting attorney asked the witness the following question:

"Doctor, from the entire examination that you made of the heart, lungs, eyes, mouth, neck, and general appearance, together with the mutilation that you have testified to, did you come to any conclusion as to how death occurred,—by drowning or by other means?"

This was objected to as incompetent. The court permitted the question to be asked, and the defendant excepted. It is insisted that the witness had not made an examination which was sufficient to base an opinion upon. I think the witness had shown sufficient examination and knowledge to base an intelligent answer upon to the question. The witness answered:

"Yes; my opinion was that the man didn't come to his death by drowning,—that he was dead before he was put into the water."

Counsel for respondent then moved to strike this answer out. This motion was properly overruled by the court.

Dr. Hatheway was a practicing physician and surgeon of thirty-three years' practice. He made an autopsy upon the body of a man found in Max lake, on August 1st. He examined the external appearance of the body, and laid off the scalp. He found no wound upon the body, except on the scrotum. A portion of that, particularly on the right side, hung like a fringe, and the left side was not so defined as a fringe, but a cut over to the left,—a fringe of four or five pieces that hung, the skin from an inch to an inch and a quarter long. He made an incision with his knife to find the testicles; but there were none. The body was swollen—distended—very much. The face and neck were as black as an African's. He also made another examination on the following Tuesday, being the one testified to by the witness Dr. Andrews. Witness was then asked if, from the examination he made, he was able to come to any conclusion or form any opinion as to whether death occurred from drowning. The respondents' counsel objected on the ground of incompetency. The witness stated that it was not a scientific opinion, and the question was then excluded by the court.

On the examination of witness the following questions were asked by the prosecuting attorney, viz.:

" Q. Now, doctor, suppose there had been bruises, without breaking the skin upon the chest, previous to death, and death occurred from strangulation,—I will say by a person putting their knees upon the stomach or chest,—would that have a tendency to hurry decomposition ?

Q. Suppose that there had been bruises on the chest previous to death, and death had occurred from strangulation, what would you say as to whether decomposition would set in earlier than it would if there had been no bruises upon the chest ?

Q. How quick?

Q. Well, now, then, after the decomposition had set in to the extent it had on this body at the time you made the examination, and death occurred by strangulation, without a fracture of the cartilage of the larynx, what would you say then about finding evidence of violence ?

Q. Suppose that decomposition had set in as far as it had on this body at the time you made the examination, and providing death had occurred by strangulation, without fracture of the cartilage of the larynx, what would you say then as to finding evidence of violence?

Q. Suppose a person was killed, strangled, and thrown into the water, would the body rise sooner or later than it would in case of drowning?

Q. Suppose that death occurred from strangulation, and the eyes and tongue protruded, and the body thrown into the water, would the eyes and tongue remain in the same condition, or would they protrude further?"

Error is assigned upon the overruling of the objection of the respondents' counsel to each of these questions. The record shows that question No. 1 was not allowed at all, and no ruling made upon it in that form. The objection to question numbered four was sustained. The fifth question was answered that "We couldn't tell; that is, presuming decomposition had gone to this extent." To the sixth question, the witness answered: "It would depend wholly upon the condition—it would depend wholly as to the length of time that had elapsed since death had taken place before it was thrown into the water." Whether the ruling was right or wrong as to the questions numbered five and six, the respondents were not prejudiced by the admission of the answers thereto. They proved nothing. The other questions were proper under the circumstances disclosed in the record. The homicide was claimed to have been committed on the twenty-eighth day of July, 1885, and the body of the murdered man was claimed to have been found in Max lake on the first day of August, 1885, in an advanced state of decomposition. A question was made as to the identity of the body, and this testimony was offered to explain its condition—the rapid rate of putrefaction; and also to show that life was extinct before the body was thrown into the lake. The testimony is not all returned; but it appears that the prosecution claimed that the homicide was committed by means of strangulation, and that there was evidence which tended to prove that theory. It was in this view of the case that the court permitted the

questions above mentioned to be put, and we are not able to say that his rulings were erroneous.

Assignments of error from the thirty-second to thirty-ninth, inclusive, refer to the admissibility of testimony relative to a substance supposed to be testicles, found upon a log about three hours after the body was found, which lay across the road leading through the woods from Bloomingdale to Max lake. There was no error in the rulings of the court with respect to the admission of this testimony. The surgeons who examined it testified positively that it was the substance called " testicles ; " but they could not swear that they were the testicles of a human being, and that they knew of no way of distinguishing the testicle of the human species from that of other animals by its anatomical structure. In connection with the evidence of the mutilated condition of the body found in the lake, the testimony was admissible.

3. The fortieth, forty-first, forty-sixth, and forty-seventh assignments of error relate to the testimony of Orange Cross. This witness was an inmate of the county jail in which respondents were confined after their arrest on the charge of murder, and was placed upon the witness stand by the people, and testified that he was somewhat acquainted with the respondents ; that he became acquainted with them in jail, and while there he had a conversation with Marshall G. Barker, he should judge about the twenty-sixth of August. He was then asked to state what conversation he had with him.

This question was objected to because there were certain alleged confessions obtained from the respondents by detectives, under the authority of the county ; and that any admissions or conversations following that detective work were not admissible, unless shown by the party offering them that they were obtained fairly, and without any fraud or undue influence, and that the influence which had been brought to bear upon the respondents by which the confessions were obtained had passed entirely out of their minds. The circuit judge then stated to counsel that there was no evidence before the jury at that time that the respondents ever con-

fessed, or that any influences, improper or otherwise, were brought to bear upon them ; and that respondents' counsel had the right to examine and find out whether anything of the kind was done, when it would be for the court to determine whether it would be admissible or not. Counsel for respondents suggested that it was the duty of the court to see that confessions were made voluntarily, and without improper influence ; but the court replied :

" I do not know, as a court, that any confessions were made at all. I have no evidence of it. There is no evidence before the court that any such confessions were made."

The prosecutor announced that he proposed, by the question asked, to prove an admission of the respondents ; but whether it was obtained from detective work he could not say at that time. Thereupon the court said to respondents' counsel :

" You may examine the witness as fully as you desire before he answers any questions, to see what influence, if any, surrounded the respondents at the time this man talked with them."

Exception was taken to this ruling.

Confessions voluntarily made, not induced by threats, or by a promise or hope of favor, are admissible in evidence in criminal cases. They are usually divided into three classes : (1) Confessions made in open court, under a plea of guilty, which are conclusive, and render any proof unnecessary ; (2) the next highest kind are those made before a magistrate; and (3) those made to any other person, which are the lowest grade, and require proof of corroborating circumstances to sustain them.

The presumption is that confessions have been freely made until the contrary appears: 1 Chit. Crim. Law, *571; *Williams' Case*, 1 City Hall Rec. 149 ; Roscoe Crim. Ev. 43 ; *Com. v. Culver*, 126 Mass. 464.

The practice to be pursued in the introduction of confessions in evidence has not always been uniform. In Phillips on Evidence it is said :

" For the purpose of introducing a confession in evidence, it is unnecessary, in general, to do more than negative any promise or inducement held out by the person to whom the confession was made :" 1 Phil. Ev. *551.

Mr. Chitty, in his work on Criminal Law, at page *572, says :

" The practice, however, at present, is for the prosecutor's counsel, on his examination of his own evidence in chief, to inquire of the witnesses all the facts, so as to satisfy the jury that the confession was voluntarily made and duly taken."

The question of the admissibility of the evidence is for the court, and not the jury, and is the subject of a preliminary inquiry : 1 Phil. Ev. *543 ; 1 Greenl. Ev. § 219.

Unless it appears from the testimony of the witness, or other evidence in the case, that the confession was not voluntary, or was made through the influence of fear or hope ; or unless the evidence offered is objected to upon the ground that the confessions were made in consequence of fear, or of favors held out to the prisoners,—no preliminary examination into the facts and circumstances is called for. If, however, the contrary does appear, or the objection is made, then the preliminary examination must be had. In this case, when the evidence was offered by the people it was objected to as being incompetent as having been made under influences which deprived it of the character of a free and voluntary confession. For all that appeared to the court at the time it was offered, it was prima facie competent. The respondents' counsel contended that it was incompetent by reason of certain extrinsic facts. It was for the respondents to establish those facts, and for the circuit judge to ascertain before admitting the evidence. We think the correct rule is laid down by the supreme court of Massachusetts in the case of *Com. v. Culver*, 126 Mass. 464, where the point was directly passed upon, in which the court say :

" It appears by the bill of exceptions that when the confessions of the defendants were offered in evidence they objected to such confessions upon the ground ' that they were made in consequence of offers of favor made to the defendants by the

officer who arrested the defendants and had them in custody.' If this were true, and the defendants could establish the fact, the confessions were incompetent evidence. It was the duty of the presiding judge to determine that fact, upon hearing all competent evidence upon it which was tendered by either party. In the absence of all evidence, the presumption is that a confession is voluntary; and when the party confessing objects that confessions are not voluntary, he is called upon to show at least enough to rebut such presumption."

As the case stood, the burden of rebutting this presumption was upon the respondents, and the court did not err in so holding.

The respondents then examined the witness Cross, and also the prosecuting attorney and sheriff, whose testimony did not show that any confessions were obtained from respondents by means of threats, or by promises of favor, or by holding out to them the flattery of hope; but did show, conclusively, that artifice and deception were used to obtain a confession from respondents. This was accomplished through a detective agency of Chicago, by which a detective, by artifice and deception, personated, and led respondents to believe that he was a lawyer of celebrity from Chicago; and in the confidence of that supposed relation obtained from them a statement of their connection with the crime.

Confidential communications made in reliance upon the supposed relation of attorney and client, whether the party assuming to act as such is an attorney or not, are excluded upon the plainest principles of justice. Indeed, the confessions thus obtained, when offered in evidence, were promptly excluded by the court. The confessions sought to be introduced were statements to or in the hearing of other parties having no connection whatever with the pretended lawyer, and upon other and different occasions. There was no testimony showing what statements the detective made to respondents to induce them to confide in him, or to make any confessions to him, other than that of his being an attorney from Chicago, at the time the circuit judge decided to admit the testimony of the witnesses relative to the alleged confessions.

We are of opinion that at the time the ruling was made by the circuit judge admitting the testimony of the witnesses Cross and De Puy, relative to the confessions made by respondents, such ruling was correct. Later in the case, communications written by one respondent to the other, and intercepted, or not delivered, were identified, and introduced in evidence; and from some of these it appeared that the detective who had assumed the role of the Chicago attorney had advised one of them to say that he committed the murder in self-defense, and the brother was called in afterwards to assist in secreting the body, and in that way he would clear them both, and especially the brother who aided and abetted after the act. Had these facts appeared prior to the introduction of the evidence relative to the confessions, it would have been incumbent upon the prosecution to prove that the confessions offered were not the result of the influences exerted by the detective: Roscoe Crim. Ev. 43; 2 Russ. Cr. 842; 1 Whart. Amer. Crim. Law, § 694. And this might have been done by showing that the particulars of the crime, as stated to these witnesses, were different from those disclosed to the detective, and could not have been under the influence of his promises; for, instead of making one brother accessory after the fact, the story of the killing, as narrated by these witnesses, made both of respondents principals in the transaction. In cases, however, where a subsequent confession is made, and it is claimed that it is subject to the objection that the party making it is under the influence of an inducement held out or exercised to obtain a previous confession, which for that reason is not admissible in evidence, the question whether such subsequent confession was the result of the same influence which induced the one previously made, is one for the jury, under proper instructions from the court: *Com. v. Cullen*, 111 Mass. 435; *Com. v. Smith*, 119 Mass. 305; *Com. v. Piper*, 120 Mass. 185; *State v. Potter*, 18 Conn. 166; *Sherrington's Case*, 2 Lewin, 123; *Rex v. Cooper*, 5 Car. & P. 535; *Com. v. Taylor*, 5 Cush. 605.

In *Com. v. Piper*, the court says:

"When a confession is offered in a criminal case, and the

defendant objects that he was induced to make it by threats. or promises, it necessarily devolves upon the court to determine the preliminary question whether such inducements were shown; and the finding of the court upon this question cannot be revised upon a bill of exceptions, unless it involves some ruling in matter of law, or the whole evidence is reported with a view of submitting its sufficiency to the appellate court. If the presiding judge is satisfied that there were such inducements, the confession is to be rejected; if he is not satisfied, the evidence is admitted. But if there is any conflict of testimony, or room for doubt, the court will submit this question to the jury, with instructions that if they are satisfied that there were such inducements they shall disregard and reject the confession."

This seems to place the matter upon the proper foundation, and properly guards and protects the rights of the accused.

In this case, in an able charge which covered all the points in controversy in the case, and to which no exception was taken, the court instructed the jury upon the subject of the confessions as follows:

" Testimony has been given before you in this case of certain alleged confessions and admissions claimed to have been made by respondents. It was the duty of the court to determine, in the first place, whether such alleged confessions were so far voluntary as to admit them in evidence for your consideration. The court did not, however, thereby determine them to be voluntary, and whether they were voluntary or not is a matter to be determined by you alone, without reference to their admission. If you find them to have been made voluntarily, you will consider them with all the other evidence in the case; but if you find that they were not voluntary, or if you find that they were made because of hopes held out to them, or because of fear, or because of inducements made to them to confess, you will reject them. Under such circumstances no reliance could be placed upon admissions of guilt, for the obvious reason that it could not be said that they were made because they were true, but because, whether true or false, the accused was led to believe it for his best interest to make them. And what I say upon this branch of the case I mean to apply also to the alleged written statements.

I further say to you that the confessions of a prisoner out of court are a doubtful species of evidence, and should be

acted upon with great caution, and, unless they are supported by some other evidence tending to show that the prisoners committed the crime, they are rarely sufficient to warrant a conviction. The credit and weight to be given to confessions depend very much upon what the confessions are. If the crime itself as charged is proved by other testimony, and it is also proved that the defendants were so situated that they had an opportunity to commit the crime, and their confessions are consistent with such proof and corroborative of it, and the witness who swears to the confession is apparently truthful, honest, and intelligent, then confessions so made might be entitled to weight. And you are also instructed that in criminal prosecutions the admissions of prisoners are received in evidence upon the same principle that admissions in civil suits are received ; that is, upon the presumption that a prisoner will not voluntarily make an untrue statement against his own interest.

I further charge you that where the verbal admissions of a person charged with crime are offered in evidence, the whole of the admissions must be taken together, as well that part which makes for him as that which may make against him, and if the part of the statement which is in favor of the respondent is not disproved, and is not apparently improbable or untrue, when considered with all the other evidence in the case, then such part of the statement is entitled to as much consideration from the jury as any other part of the statement. Alleged confessions and statements of these respondents were received simply and only as affecting the particular one alleged to have made them, and cannot be considered by you against the other."

Although we conceive it to be the province of the court to determine, in a case free from doubt, whether the confession is voluntary or not before admitting or rejecting the same as evidence, yet, in this case, we think he properly submitted that question to the jury, and the respondents do not complain of this instruction. The assignments of error based upon the rulings of the court relating thereto are overruled.

Objection was made to the introduction of certain exhibits which were admitted in evidence. These exhibits were written notes which the witness testified were handed to him by one of the respondents to be delivered to the other, and, instead of delivering them, the witness handed them to the sheriff or to his wife. The witness identified the exhibits,

and they were offered in evidence. The objection was that the handwriting was not proven. The court ruled that,

"Whether the handwriting be proved or not, is a question that is necessarily involved in the question as to whether these papers should be admitted in evidence. The witness states that he received them from the parties, and that he handed them to Mrs. Todd. If he did so receive them, they are admissible in evidence; and whether he received them and handed them to Mrs. Todd is a question of fact for the jury; therefore they will be received."

There was no error in this ruling.

After the counsel for the People announced that the testimony for the prosecution was closed, the counsel for respondents then called one Matt W. Pinkerton, who, being sworn and examined on the part and in behalf of the respondents, testified that he resided in Chicago; that he had been in Paw Paw before; that he was there first on the nineteenth of August; that he had seen the respondents. And counsel for the respondents then asked the witness the following question;

"*Q.* I want to ask you if you ever called the attention of Marshall G. Barker to section 9416 of the Statutes of Michigan?
*A.* I did; I think that was the section.
*Q.* (Showing book to witness.) Just look at it. Counsel for respondents then stated: 'I offer this as explanatory of the notes.'
*Q.* That was prior to bringing the subject to the attention of William Barker, was it?
*A.* It was after,—after the first interview with him."

Counsel for respondents then read the section of the statute in evidence. The counsel for the People then proceeded to cross-examine the witness, and asked him:

"*Q.* Did you have a conversation with Marshall G. Barker?
*A.* I did.
*Q.* In relation to Harvey Keith?"

The respondents' counsel then objected to any conversation as not cross-examination. It appearing that the conver-

sation was at the same time (by the further examination of the witness), the court overruled the objection, and permitted the witness to be cross-examined, and to testify to the conversation had at that time. Upon this ruling error is assigned.

It is laid down by Mr. Phillips that,

" If a witness is sworn, and gives some evidence,—as, for instance, to prove an instrument,—however formal the proof may be, he is to be considered a witness for . all purposes. Or if a witness is sworn, and would be competent to give evidence for the party calling him, the other party will be entitled, strictly, according to the general rule, to cross-examine him, although he has not been examined in chief : "

2 Phil. Ev. *898; *Morgan v. Brydges*, 2 Starkie, 314 ; *Wentworth v. Crawford*, 11 Tex. 127 ; *Beal v. Nichols*, 2 Gray, 264.

In the last case cited the witness was called by the defendant for the sole purpose of proving the execution of two written contracts which the plaintiff refused to admit. The witness was then cross-examined generally, against defendant's objection. Bigelow, J. said :

" We see no valid objection for changing the rule, as it has long been established and practiced upon in this commonwealth, that a party calling a witness, even for formal proof of a written instrument, or of other preliminary matter, thereby makes him his witness ; nor can he put leading questions to him unless permitted to do so by the court in the exercise of a sound discretion. It follows that the adverse party has the right to cross-examine the witness upon all matters material to the issue."

Our own rulings upon the scope of cross-examination are familiar to the Bar, and have been quite as liberal as those of the Supreme Court of Massachusetts: *People v. Hare*, 57 Mich. 505 ; *Thompson v. Richards*, 14 Mich. 172 ; *Chandler v. Allison*, 10 Mich. 461 ; *New York Iron Mine v. Negaunee Bank*, 39 Mich. 658 ; *Driscoll v. People*, 47 Mich. 413 ; *Jacobson v. Metzger*, 35 Mich. 103 ; *Lichtenberg v. Mair*, 43 Mich. 387 ; *Railroad Co. v. Van Steinburg*, 17 Mich. 99 ; *O'Donnell v. Segar*, 25 Mich. 367 ; *Wilson v. Wagar*, 26 Mich. 452 ; *Haynes v. Ledyard*, 33 Mich. 319 ;

*Stearns v. Vincent,* 50 Mich. 221; *People v. Murray,* 52 Mich. 288; *Joslin v. Grand Rapids Ice Co.,* 53 Mich. 322; *Dalman v. Koning,* 54 Mich. 320.

There was no error in permitting the cross-examination of the witness.

The exceptions are overruled, and the judgment is affirmed.

CAMPBELL, C. J., and SHERWOOD, J., concurred.

MORSE, J. dissenting. I cannot consent to affirm the conviction in this case. Every man, under the constitution of our State and nation, is entitled to a fair trial, which these respondents have not had.

The treatment of these men, after arrest and before trial, by the prosecuting attorney and sheriff of Van Buren county, was an outrage upon justice, for which there can be given no possible excuse, and the results of which, as intended, were used against them, without right, upon the trial of the cause.

It is true that the community were satisfied, generally, of their guilt, and apprehensive that justice might be defeated by some slip or technicality; but this cannot excuse unfair, unlawful, or treacherous dealing with the accused, who were imprisoned and at the mercy of the law and its executors.

The more aroused and higher the feeling against them, the more necessity that, in the due and orderly administration of justice, the safeguards of the constitution and the laws should not be removed or kept from them, and the more reason why ample opportunity should have been afforded them to employ and receive the advice and assistance of attorneys of their own choice and seeking.

A more shameful and disgraceful method of depriving men accused of crime of any opportunity of employing counsel and acting under their advice; a more oppressive and deceitful course of conduct to prevent their enjoyment of their constitutional privileges; and a more mean and wicked betrayal and suppression of their rights under the law by these two officials,—I have never read in the history of American

jurisprudence. It seems like going back into the dark ages of the administration of criminal law, when a person accused of crime was allowed no counsel to act or speak in his behalf, and was subjected to the examination and brow-beating of the prosecutor, assisted often by the judge, without any right or privilege worth naming to protect himself.

It is to be hoped that such proceedings as are shown by the record in this case are not to be repeated or made a precedent in our State. I, for one, am not disposed to tolerate such action, even if the consequences of my judgment should go further than the reversal of an otherwise just conviction.

As related by their own oaths, the scheme worked out, by agreement between the prosecuting attorney, sheriff, and one Matt Pinkerton, a detective, was to keep away from the respondents in this case all attorneys, to introduce Pinkerton as a lawyer, get him employed by them, and then, as their pretended counsel, worm out a confession from one or both of them, and by a betrayal of their confidence use the confession in evidence to convict them. Acting upon this preconcerted scheme, the prosecuting attorney and sheriff kept a letter written by Marshall G. Barker to Howard & Roos, attorneys at Kalamazoo, and also refused Mr. Roos an interview with the respondents when he came to Paw Paw for the purpose of seeing them. They also keep all other counsel from them until a letter from the circuit judge informs them that the Barkers are entitled, and have the right, to see attorneys of their own choice.

A detective, passing under the name of Stearns, is sent by Pinkerton from Chicago to meet the prosecuting attorney, and act under his direction. The prosecuting attorney swears, in substance, that this man Stearns, under his advice and direction, forged a note, and went to the bank and attempted to pass it. The prosecuting attorney then drafted a complaint, procured some one to verify it, and arrested Stearns for forgery, and placed him in jail where he could have access to the respondents. Another detective, Matt. Pinkerton, then arrives upon the scene, ostensibly as the attorney employed to defend Stearns, and passing under the

name of A. S. Trude, a prominent lawyer of Chicago. The sheriff swears that he introduced Pinkerton to the Barkers as an attorney, and as A. S. Trude, from Chicago, in Paw Paw for the purpose of defending Stearns against the pretended charge of forgery. And while he detains the letter written by Marshall to Howard & Roos, and prevents the Barkers seeing or employing counsel, he advises the respondents to employ Pinkerton, *alias* A. S. Trude, as their attorney, which advice they accept and follow.

The detective Pinkerton, personating Trude, becomes their attorney, and thereby secures the faith and confidence of the accused. He, as their attorney, advises them what story each shall tell in order to get Marshall off with a light sentence and to acquit William of any offense whatsoever. He gains a confession from each of them, in accordance with his theory, which he writes down. The whole object of this scheme was to obtain such a confession, and then to use it against them, as admitted by the prosecuting attorney and sheriff. The sheriff very frankly says upon the witness stand that "Pinkerton was introduced there for the purpose of gaining the confidence of the Barkers by the representations he might make to them,—the object was to get a confession from them."

That at the time he kept the letter from Marshall to Howard & Roos he did not want Barker "to have an attorney until Pinkerton had got through his part with him."

When these confessions had been secured, the detective Stearns, who had been allowed the liberties of the jail upon a charge of forgery, was released and disappears. The Barkers are thereupon informed by the bogus Trude that Stearns was discharged in court because he had followed the advice of his attorney, "Trude." While these respondents were thus confined in jail, denied the assistance or sight of counsel, save this pretender by whom they were being deceived and betrayed into admissions of guilt, the officials heretofore named employed another party in the jail, who took into his possession notes and letters from Marshall to William, and from Marshall to his wife, and from William

60 MICH.—20

to Marshall, and handed them, as received, to the wife of the sheriff.

The written confessions obtained by Pinkerton in his character of Attorney Trude were procured for the express purpose of being used as evidence upon the trial, and were offered by the prosecuting attorney after the circumstances of their procuration had been detailed in court. They were very properly ruled out by the court, the circuit judge evincing throughout the whole trial a very manifest disposition to give, as far as it was in his power, these men a fair and impartial trial ; yet I cannot but think that he committed a very grave error in admitting the notes and letters in the keeping of the sheriff's wife, in evidence. It had the effect of partially, at least, carrying out the conspiracy of the detectives and officials against the lives and liberties of the respondents, as well as against the law. These notes and letters were written, many of them, during the time Pinkerton was acting as the pretended but trusted attorney of the Barkers, who were blindly and implicitly following his advice. Others were written after his real character was known to them, and bore evidence upon their face of the great wrong that he had done them in his dual capacity of attorney and detective. Nearly every one of them was tainted with the poison of this vile conspiracy against their rights as citizens, unless it be held that the mere fact of arrest for crime shall make a man a felon, and serve as an antidote against any and all wrongs that may be perpetrated upon the accused before trial.

Some of these notes made reference to their supposed lawyer, and what he had advised them to do. Here are two of them :  Exhibit A, 17.

" Bill, the way your woman and mine is swearing, that is the only way to get out clear. Don't be afraid, for we are innocent ; but I want to get clear, and can't no other way. Now, Bill, don't wait too long, for he [Pinkerton] says he can clear you any way, and me too. If you don't, you will go over the road by the way your woman says. Tell me the reason you don't say so. Don't wait, now.

M. G. BARKER."

Exhibit A, 18:

"The lawyer wants my brother to say to help me as a brother, to carry off the body; and for me to say I did kill him in the house—choked him to death; and went and got my brother to help as a brother to conceal and get him out of the way; and seeing the woman swears to a lie, we had to do the same to clear us in it. He says not to be afraid, in the least, of nothing."

This detective, acting as attorney, made these men believe that their wives were testifying against them, or would do so, and that the only way to get out of the matter was for Marshall to confess that he choked Keith to death in the bedroom, and that William had no part in the killing; but as a brother, after the deed was done, helped Marshall to conceal the body to cover up the traces of the crime.

The alleged admissions or confessions of William Barker to De Puy, and of Marshall Barker to De Puy, in the presence of the witness Conkle, were made while these men were under the influence, and acting on the advice, of Pinkerton, and should have been excluded.

It also appears that all the notes were written after Pinkerton had gained the confidence of the defendants, and some of them, especially one written by Marshall to William, told the story of the killing as was advised by Pinkerton, and urged William to follow the same story, as the lawyer said it was the only way to get clear. In fact, every admission, written or verbal, introduced against the Barkers, was in corroboration of the theory mapped out by Pinkerton.

These respondents, under his advice and dictation, followed the lines marked out by him in these admissions, and as soon as they found out that he had deceived them, and was not an attorney, but a spy, they denied them. It needs but a glance at the record to show that if it had not been for the work of Pinkerton, there would have been no admissions or confessions by these men. It is not disputed but they were made while Pinkerton was acting as their attorney, and in accordance with the theory which he impressed upon them as their only means of salvation. This was known and shown in court before any of them were admitted. The court left it

to the jury to determine whether they were voluntary or not. This was a grave and substantial error that I cannot overlook. As a matter of pure law, they were plainly not voluntary, and the court should have so decided. Not only was the hope and promise of favor held out to them, but they were obtained by the grossest fraud and deceit. What any person confides to his attorney, even in a civil cause, is most zealously guarded and kept secret by the law ; but by a trick in this case the confessions made to a pretended attorney, under his advice, are also, in substance, verbally communicated to others in furtherance of the plan devised by him, as he claimed, for their escape, and then allowed to be used against them. Every element of the law cries out against these proceedings, and human nature is outraged at this exhibition of official treachery and duplicity upon the part of the prosecuting attorney and sheriff, who joined and aided in the detective's plan ; and it does not seem to me that the excuse that " any means justifies the end " should be supported by the courts in Michigan in this enlightened age.

It is true that some people at once jump to the conclusion that a person is guilty from the fact of his arrest, and that there is always more or less clamor at the " law's delay ;" and those who form these hasty judgments, fret and chafe against the barriers that the law has placed about the life and liberty of those accused of crime. But the maxim that " every man shall be presumed innocent until he is proven guilty " should be obeyed and followed by those whose duty it is to execute and administer the laws. There can be no excuse for the employment of such means to obtain a conviction as were used here. If the law cannot be enforced, or crime punished, without depriving the accused of counsel, and foisting upon them a detective as an attorney, with the purpose of advising action on their part to betray and convict them, it would be as well, and less expensive, to dispense with courts and juries, and authorize the prosecuting attorney and sheriff at once to pass judgment upon persons arrested, and, if convicted in the minds of these officials or of the community, convey them without further trouble to state

prison. If men who are supposed to be guilty can be treated in this way, then may an innocent man also be subjected to the same usage.

I also think the court erred in allowing the cross-examination of Pinkerton, and permitting him to state what the Barkers said to him, while he was acting as their attorney, as to where the testicles of Keith could be found. He was placed upon the stand by counsel for defendants, and asked if he did not show to the Barkers section 9416 of Howell's Compilation of the Statutes of this State. This was done to show that before Pinkerton obtained the confessions, and in furtherance of his pretended theory for saving them, he pointed out this statute to confirm them in the belief that if William would confess to helping hide the body after death he would escape punishment because of his relationship to Marshall. Pinkerton admitted showing it. This might, perhaps, ordinarily be ground for admitting all that was said and done upon that occasion; but, in my opinion, in this case it could not open the lips of Pinkerton to disclose the confidential communications of one who supposed he was talking to his counsel. The mere showing that he took the statutes, and read or pointed out a section of the same, could not break the seal the law has set upon confidential disclosures of a client to an attorney.

Neither do I think the court had a right to set aside a juror, upon his own motion, because he was a few moments late, and had been playing pool. If it was done for either or both of these faults, it was not enough to justify such action. Judges and attorneys, in my experience as a practitioner, have been often as far behind the time of the meeting of the court as this juror was, and I am not disposed, as a moral question, to decide that playing pool disqualifies a man from serving on a jury; nor do I think the law authorizes the trial judge to set up any moral code of this nature, and, by a too rigid idea of a juror's conduct, deprive a party of a juror with whom he may be satisfied. But as the respondents' counsel announced themselves content with the jury as

selected, with challenges still remaining in their hands, it was an error without prejudice in this case.

In all other respects than these above noted, I agree with the opinion filed by Mr. Justice CHAMPLIN.