PEOPLE v. PRESTIDGE.

1. CRIMINAL LAW — EVIDENCE — CONFESSION — VOLUNTARY CHARACTER.

The question whether a confession was voluntary or involuntary is for the court, if the matter is clear and the testimony is undisputed; if there is ground for doubt, the court may leave it to the jury to determine whether or not the confession should be considered.[1]

2. SAME—INVOLUNTARY CONFESSION—RAPE.

Where the respondent was taken into custody without being informed concerning the charge, was taken to the prosecuting attorney's private office, where he was first

[1] On the question when confession is voluntary, see note in 18 L. R. A. (N. S.) 772.

advised of the fact that he was charged with statutory rape; and where he was advised by the officers that he had better tell the truth, and was questioned closely for two or three hours, and where his wife was brought into an adjoining room and underwent an attack of hysteria, respondent hearing the moans and afterwards admitting that he wished he had told her the truth, etc., the alleged confession of the accused should have been rejected by the court.

Error to Branch; Chester, J., presiding. Submitted June 12, 1914. (Docket No. 101.) Decided July 24, 1914.

Edwin Prestidge was convicted of statutory rape. Reversed.

*Palmer & Palmer* and *Lockerby & Bowen,* for respondent.

*Grant Fellows,* Attorney General, and *Charles U. Champion,* Prosecuting Attorney, for the people.

BIRD, J. The respondent was convicted in the Branch circuit court of the crime of statutory rape on his stepdaughter, Mildred Garmen. The people relied for conviction upon the testimony of Mildred, and also upon a statement, which it is claimed the respondent signed, admitting his guilt soon after being taken into custody by the sheriff. The serious question raised by appellant in this court is with reference to the admission of the claimed confession. Considerable preliminary testimony was taken bearing upon the question as to whether the confession was voluntary. The trial court finally admitted the confession, but left it to the jury to determine whether it was voluntarily made. The respondent insists that the trial court was in error in so doing; that he should have rejected the confession on the ground that it was made clear by the testimony that it was not voluntary.

182 Mich.—6.

If the preliminary testimony made it clear either that the statement claimed to have been made was voluntary or involuntary, it was the duty of the trial court to admit or reject it. If the testimony left the question in doubt, it was the duty of the court to admit it, and leave the question to the jury under proper instructions to determine whether it was voluntarily made. *People* v. *Barker*, 60 Mich. 277 (27 N. W. 539, 1 Am. St. Rep. 501). We are persuaded, after a careful review of the uncontradicted testimony, that the statement was made under such circumstances that it was not voluntary. The respondent was taken away from his work between 3 and 4 o'clock in the afternoon by the sheriff. When taken into custody, he inquired the reason, and was told he would be informed later. He was taken to a room in the rear of the prosecutor's private office, where he was informed of the charge made against him, and was questioned by Sheriff Tyler, Undersheriff Miller, and the prosecuting attorney for upwards of two hours as to his past relations with the girl. The respondent repeatedly denied the charge, but was told by Miller that he was lying, and that he had better tell the truth about it. During the time the examination was going on, Mildred was brought in to confront the respondent. What then took place is described by Miller:

"We had been up there probably an hour, maybe not so long as that. Mr. Tyler and Mr. Prestidge and myself in this room, and I went out in the other room where Mildred was and took her into the room where Mr. Prestidge was, in the rear of Mr. Cowell's office. I told her, if what she told me was true, I wanted her to say it to her father, and she told him that what she had told me was true, every word of it, in his presence. By her father, I mean Mr. Prestidge. I asked the girl if her father had been intimate with her, in his presence, and I said, 'If that is true, Mildred, look him in the face and tell him it is so.'

That is word for word as I used it with her in his presence, and she looked him in the eye. I said, 'Ed, why don't you look her in the eye?' She looked him in the eye. She said. 'It is true, and he knows it;' and he dropped his head, and simply said it wasn't true."

The respondent's wife was also brought to the private office of the prosecutor, and while there she became so hysterical over the affair that a physician was summoned to attend her. The respondent was in an adjoining room, and, hearing her cries and moans, requested permission to go in and see her; but this request was denied. The respondent was kept in this room till after dark, when the sheriff and prosecutor left, leaving him in charge of Undersheriff Miller. Miller's version of what was said follows:

"As I said, they had all gone home. Ed and I were there alone, and I says to him, 'Ed,' says I, 'we are alone. Don't you right down deep in your heart wish that you had told your wife the truth in regard to this matter before she went home, and gone down on your knees and asked her forgiveness?' I says, 'Maybe she would have forgiven you. Don't you wish you had done it, Ed?' He says, 'Yes.' I says to him, 'Mr. Cowell has started home, and you are going to jail. Don't you wish you had told him the truth before he went home? If you want a chance to tell him the truth, Ed, I will call him back. Shall I call him back, Ed?' And he says, 'Yes;' and I called Mr. Cowell back."

The prosecutor was then called back, and the respondent was taken to jail, where the statement was written out by the prosecutor and signed by the respondent.

A few of the questions and answers taken from the testimony of Miller will illustrate the character of the examination carried on to secure a statement from the respondent:

"*Q.* Didn't you say that you had kept him there

from the middle of the afternoon until after Mr. Cowell had gone home at night, and after dark, to have him tell you what you thought was the truth?

"*A.* I kept him there; yes.

"*Q.* After he had repeatedly stated to you that it was false, what he was charged with?

"*A.* He said so; yes.

"*Q.* But you did not believe him?

"*A.* I did not; no, sir.

"*Q.* You were not going to let him go until he had told you something that you believed to be the truth?

"*A.* Oh, I wasn't going to keep him there all night.

"*Q.* You were going to give him a good trial?

"*A.* Yes.

"*Q.* You gave him quite a sweating out, didn't you?

"*A.* I did; yes.

"*Q.* You did it for the purpose of getting him to tell something which you thought was the truth?

"*A.* I did; yes, sir.

"*Q.* And all of this statement that he has testified to—that you claimed he admitted, was that after you had brought him to that state where you wanted to leave him?

"*A.* Oh, I don't know as to that.

"*Q.* One thing is certain, Mr. Miller; he never made any kind of a statement until after you had placed him in that sweat box for three hours or more; isn't that a fact?

"*A.* Oh, I don't know how long we had been there.

"*Q.* He had been there long enough, hadn't he?

"*A.* Why, I think so.

"*Q.* So that they had gone home for the night? Mr. Tyler had gone to his place?

"*A.* Yes, sir; and Mr. Cowell had gone home.

"*Q.* Now, Mr. Miller, before he had made any admissions, as a fact, you said, 'Now, Ed, you are going to jail. Don't you think it would have been best to have gotten right down on your knees and begged your wife's forgiveness, and maybe she would have forgiven you?' Isn't that right?

"*A.* And tell the truth? I did; yes, sir.

"*Q.* What you thought was the truth?

"*A.* Yes, sir. * * *

"*Q.* In other words, you went in there with the

idea in your mind as to what the truth was, didn't you?

"*A*. I believed the girl.

"*Q*. In your mind, you believed the girl, and went in there with that idea as to the truth?

"*A*. Yes, sir.

"*Q*. And you kept that man there until he admitted to what you believe was the truth?

"*A*. He did; yes, sir.

"*Q*. In the meantime, to bring it about, you told him that, if he would do that, maybe his wife would forgive him?

"*A*. I did.

"*Q*. When, as a matter of fact, there hadn't been a word said with his wife—or that his wife believed him guilty, was there?

"*A*. Not to me."

The respondent's version of his treatment makes the situation more serious; but much of his testimony was contradicted. It will be unnecessary, however, to consider the testimony that was in conflict. The respondent states that during the time of the examination he was very nervous and nearly crazy. It is not incredible that he should have been in that condition at the end of two or three hours of grilling such as he received. It is needless to argue that a statement made under such pressure is voluntary, whether it is true or false. *Flagg* v. *People,* 40 Mich. 706; *People* v. *Wolcott,* 51 Mich. 612 (17 N. W. 78); *People* v. *Barker, supra; People* v. *Stewart,* 75 Mich. 21 (42 N. W. 662). Had such an examination taken place solely to satisfy the minds of the prosecuting officers as to whether the accused was guilty, it might find some justification; but to subject the respondent to such an ordeal, with the deliberate purpose of securing a statement to be used as evidence against him, is a practice not included among the duties of prosecuting officers. It was doubtless done in good faith; but it was a case where their zeal clearly outran their

duty. We are satisfied that under the showing made the statement was inadmissible, and should have been rejected. The conviction must be set aside, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred.