PEOPLE v. FARMER.

1. Homicide—Voluntariness of Statements and Confession.

Issue of involuntariness of defendant's statements and confession *held*, not raised in 1958 either prior to, or upon, trial for first-degree murder, but if it had been, the trial judge would have excluded the confession upon a determination of involuntariness or, in case of doubt, the issue of voluntariness would have been presented to the jury for its determination (CL 1948, § 750.316).

2. Same—Voluntariness of Confession—Waiver.

Issue of voluntariness of defendant's confession *held*, under normal appellate procedures, either not present or waived, where defendant in prosecution for first-degree murder was represented by counsel at all stages of the proceedings in which he was entitled to counsel and no claim of inadmissibility of the confession was raised during trial (CL 1948, § 750.316).

3. Same—Unreasonable Detention Before Arraignment.

Claim of defendant, who was convicted of first-degree murder, that 72-hour detention before arraignment was unreasonable *held*, without merit under record presented showing 1 of the codefendants had fled the State and the detention had not been for the purpose of coercing a confession (CL 1948, § 750.316).

---

References for Points in Headnotes

[1] 29 Am Jur 2d, Evidence § 582 *et seq.*
[2] 29 Am Jur 2d, Evidence §§ 583, 588.
[3-5] 29 Am Jur 2d, Evidence § 547.
  Admissibility of pretrial confession in criminal case—Supreme Court cases.  1 L ed 2d 1735, 4 L ed 2d 1833, 12 L ed 2d 1340.
  Admissibility of confession as affected by delay in arraignment of prisoner.  19 ALR2d 1331
[6] 5 Am Jur 2d, Appeal and Error § 549.

4. CRIMINAL LAW—DETENTION—TEST FOR INVOLUNTARY CONFESSION.

  The test as to whether a detention renders a confession involuntary is not the reasonableness of the length of time a person is detained but whether the detention has been used to coerce a confession.

5. SAME—ARREST—ARRAIGNMENT—CONFESSION.

  Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties, but delay must not be of a nature to give opportunity for the extraction of a confession.

6. APPEAL AND ERROR—ERROR NOT SAVED—MISCARRIAGE OF JUSTICE—FAIR TRIAL.

  Supreme Court has inherent power to review even if error has. not been saved, but such inherent power is to be exercised only under what appear to be compelling circumstances to avoid a miscarriage of justice or to accord a defendant a fair trial.

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and J. H. Gillis and Levin, JJ.   Submitted December 7, 1967.   (Calendar No. 50, Docket No. 51,754.)   Decided March 4, 1968.

Burton Farmer was convicted in Recorder's Court of the City of Detroit of first-degree murder.   Court of Appeals remanded for a confession voluntariness hearing.   Court of Appeals denied application for rehearing.   The people appeal.   Reversed and judgment of conviction affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*James M. Skillman,* for defendant.

Adams, J.

## I. The Facts

Shortly after 8 a.m. on Saturday, January 11, 1958, following 10 days of planning and two unsuccessful attempts, Andrew Madison, Turner Madison, and Burton Farmer held up the Prince Royal Bar at 3057 Gratiot avenue in the city of Detroit.

Andrew Madison guarded the front door with a .38 caliber revolver. Defendant Burton Farmer walked behind the bar. After removing approximately $100 in bills and change from the cash register, he ordered Donald Coulter, an off-duty Detroit police patrolman, to open the safe. At approximately 8:30 a.m., Turner Madison fatally shot Patrolman Coulter with a sawed-off 12-gauge shotgun. Coulter had reached for his service revolver.

The three robbers went to 3734 McDougall, the house of Essie Lee Graham. They divided the money. Essie Graham took the guns and defendant's clothing to a room occupied by defendant's mother at 3311 East Congress. Defendant was arrested with Andrew Madison that same morning in a second-floor bedroom at 3734 McDougall. He was arraigned three days—72 hours—later on the morning of Tuesday, January 14, 1958.

Andrew Madison, Turner Madison, and Burton Farmer were charged with murder in the first degree.[1] After two partial days of trial, the Madisons entered pleas of guilty. Essie Lee Graham pled guilty to the charge of being an accessory. The trial continued as to Burton Farmer. Defendant was represented by retained counsel at the preliminary examination and the trial.

Officer Albert Evans testified that he first talked with Farmer on January 11, 1958, at about 11:30

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).—Reporter.

a.m., and again at 4:10 p.m., when defendant stated that he knew nothing about the shooting at the bar; that he questioned defendant again on January 13 when defendant told him that he had used a hacksaw to saw off a shotgun; that defendant stated he gave the shotgun to Turner Madison; that the same weapon was used in the shooting; that defendant was present in the bar and saw Turner Madison shoot Coulter; and that he admitted participating in the holdup. Defendant's counsel did not object to this testimony.

Officer Charles Schlachter testified that he questioned defendant at police headquarters on January 11, 1958, at 10 p.m.; that defendant told him he took money from the cash register; that, when one of the patrons drew a revolver and pointed it at Turner Madison, he was shot by Turner Madison; that the defendant told him he had borrowed the shotgun with which Coulter was killed and had sawed off the barrel and stock, but that defendant did not fire the gun. Defendant's counsel made no objection to this testimony.

Officer William Clinton testified that on Sunday afternoon, January 12, he took defendant to the scientific laboratory for a nitrate test on his hands; that the test was performed about 5:15 p.m., at which time defendant told him:

"I'll make a statement. I was the number two man. I was in the bar when it happened and I did not shoot the man."

Defendant's counsel did not object to this testimony.

Inspector Albert Langtry testified that he conducted the nitrate test. He verified Officer Clinton's statement of what defendant said at that time. Again, defendant's counsel made no objection.

During the testimony of Officer Schlachter, the transcript further shows:

"*By Mr. Coury* [assistant prosecutor]:

"*Q.* Have you the statement that was taken by Mr. DeRyck in the prosecutor's office?

"*A.* I have.

"*Mr. Coury*: Mr. Patrick, have you seen this statement?

"*Mr. Patrick* [defendant's counsel]: I have not, sir."

A recess was then taken. During the jury's absence, the transcript shows:

"*The Court*: Are you going to read it into the record?

"*Mr. Coury*: Yes, Your Honor.

"*The Court*: Well, Mr. Patrick, do you stipulate and agree that the signed,—it is a statement allegedly made by the defendant in the presence of Jack Kaufman, court reporter, which has now been typewritten and marked exhibit 16, that it is a true and correct transcript of the statement made by your client as designated in the exhibit 16?

"*Mr. Patrick*: That is right. After having talked with my client, Your Honor, we reviewed the statement briefly. He agreed, and I agreed that this be done.

"*The Court*: Very well. Are we all ready?

"*Mr. Patrick*: I am ready.

"[Whereupon people's proposed exhibit 16 was marked by the Reporter.]"

In the presence of the jury, the officer testified further:

"*Q.* Now, you were present when a statement was taken from the defendant by Assistant Prosecutor DeRyck?

"*A.* I was.

"*Q.* And have you a copy of that statement here?

"*A.* Yes.

"*Q.* Will you read it?

"*A.* This is a statement taken at the office of Mr.—

"*The Court*: Well, wait a minute.  Do you offer this in evidence?

"*Mr. Coury*: I offer this statement in evidence as people's exhibit No. 16.

"*Mr. Patrick*: No objections.

"*The Court*: Very well.  May be admitted."

Defendant's statement was then read.  It showed that it was taken on Sunday, January 12, 1958, commencing at about 10:25 p.m., in the presence of Officer Schlachter, another officer, and an assistant prosecutor.  The statement recited that no threats had been made, that defendant had been treated all right, that he knew he did not have to make a statement unless he wanted to do so, and that any statement he made could be used against him in court.  The confession, in detail, recites that defendant and the Madisons robbed the bar and that Turner Madison shot the patron.  No objection was made to admission of the statement at any time.

At the conclusion of the testimony, defendant's counsel stated that he had no requested instructions. The jury was charged by the recorder's court judge to make a determination as to whether any confession was voluntary, and if so to give it such consideration as the jurors believed it was entitled to receive.  At the conclusion of his instructions to the jury, the judge asked if there were any other requests.  Defendant's counsel replied, "No."

On April 29, 1958, the jury returned a verdict of guilty.  Mandatory sentence of life imprisonment was imposed.  On October 5, 1966, defendant, by court-appointed counsel, filed with the Court of Appeals an application for delayed appeal.  The Court of Appeals remanded for a confession voluntariness hearing, in accordance with the procedure set forth in *People* v. *Walker* (On rehearing, 1965), 374 Mich 331.  Application by the people for rehearing was denied.  This Court granted leave to appeal.

## II. THE QUESTIONS

It is the claim of the prosecutor that in a pre-*Walker* conviction, unless the record reveals some fact or circumstance indicating that a confession was made in consequence of fear or promise of favors, no *Walker*-type hearing should be accorded a defendant.

It is the claim of the defendant (a) that he has an absolute right as a matter of due process of law to a *Walker*-type hearing but that (b) even if he is not absolutely entitled to such a hearing there were sufficient unusual circumstances present in this case to entitle him to one.

## III. THE LAW

The issue of involuntariness of defendant's statements and confession was not raised in 1958 either prior to trial or upon trial. If it had been, the recorder's court judge would have excluded the confession upon a determination of involuntariness or, in case of doubt, the issue of voluntariness would have been presented to the jury for its determination. *People* v. *Barker* (1886), 60 Mich 277; *People* v. *Prestidge* (1914), 182 Mich 80; *People* v. *Burlingame* (1932), 257 Mich 252; *People* v. *Louzon* (1953), 338 Mich 146. Though defendant was represented by retained counsel, because no objections were made, neither procedure was followed. It must be concluded that either there was no issue of involuntariness or that such issue was waived as a matter of trial strategy. As was stated in *People* v. *Lundberg* (1961), 364 Mich 596, 604:

"[Since no objection was made] the trial court had no occasion to take proofs and to consider whether defendant's arrest and detention were illegal thereby subjecting his confessional statements made during

such detention to the exclusionary rule announced in *People* v. *Hamilton* [359 Mich 410]."

While the rule announced in *Walker* was made retroactive, it does not follow that in every trial prior to *Walker* in which a confession was admitted in evidence a defendant is now automatically entitled to a *Walker*-type hearing. See, for example, *People* v. *Fordyce* (1966), 378 Mich 208.

Under normal appellate procedures, since defendant was represented by counsel at all stages of the proceeding in which he was entitled to such representation and no claim of inadmissibility was raised, there would be no assignment of error for an appellate court to review. This would end our consideration of the case.

Though the further claim of the defendant of unreasonable detention is considered to be without merit, it is not evident from the Court of Appeals' order of February 2, 1967, remanding for a *Walker*-type hearing, the reason for the Court's order. The substance of defendant's claim is now examined for the purpose of demonstrating why such a nonmeritorious claim, not saved for review, should not be considered. It is maintained that the detention of defendant for three days—72 hours—from the morning of January 11, 1958, to the morning of January 14, 1958, before arraignment was such a lengthy detention as to render the confession involuntary. While this Court has repeatedly condemned the practice of undue detention, the test as to whether such a detention renders a confession involuntary is not the reasonableness of the length of time a person is detained but whether the detention has been used to coerce a confession. As was said in *United States* v. *Mitchell* (1943), 322 US 65, 70 (64 S Ct 896, 898, 88 L ed 1140, 1143):

"There was no disclosure induced by illegal detention."

The duty to arraign and the nature of an improper delay has been stated by the United States Supreme Court in *Mallory* v. *United States* (1957), 354 US 449, 455 (77 S Ct 1356, 1359, 1 L ed 2d 1479, 1483), as follows:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. *But the delay must not be of a nature to give opportunity for the extraction of a confession.*" (Emphasis supplied.)

The proposition was stated by Justice BLACK in *People* v. *Hamilton* (1960), 359 Mich 410, 417:

"An unnecessary and so unlawful delay of compliance with either of said sections 13 and 26,[2] *when done for prolonged interrogatory purposes and without proven justification of the delay,* renders involuntary and so inadmissible whatever confessional admissions the detained person may have made while so unlawfully detained." (Emphasis supplied.)

The proposition was examined more recently in *People* v. *Ubbes* (1965), 374 Mich 571, 576, in which case Justice O'HARA wrote:

"The lapse of 16-1/2 hours *per se* is not conclusive. Time of detention alone, without arraignment, is not the test. If for the same 16-1/2 hours defendant had been held without appearance before a magistrate and he had been 'sweated,' *i.e.,* questioned unremittingly for the purpose of extracting a confession,

[2] The sections referred to here are CL 1948, §§ 764.13, 764.26 (Stat Ann 1954 Rev §§ 28.872, 28.885).—REPORTER.

.we would not hesitate to strike down the practice and withhold from jury consideration his alleged confession."

. Justice SOURIS summed up the situation in *Ubbes* as follows (p 586):

"What we have here is a nighttime arrest in his own home of a theretofore respectable member of a rural community, without an arrest warrant, for possession of a stolen chattel. Having arrested defendant, presumably believing they had probable .cause sufficient to support their action, the police officers did not promptly take defendant before a mag-.istrate as required by law to do but, instead, they subjected him to a course of interrogation, without the benefit of counsel or even so much as any advice about his constitutional right to remain silent, from .the time of his arrest early one evening until the following afternoon, with only a scant period of respite in the night, for the admitted purpose of getting a confession from him."

In the present case, the first statement given by defendant was made on the same day and within hours of the robbery and murder. It was followed by a second statement, also on the same day, and by a third statement and a detailed confession on the following day. Though the police might well have proceeded to arraign Farmer, one of the four persons involved had fled from Michigan. Turner Madison was arrested on Monday in the State of Arkansas. Three of the persons accused of the crimes committed on Saturday morning were arraigned the following Tuesday. Defendant was questioned immediately following his confession as to the treatment he had received and was given a medical examination. Under the facts of this case, there is nothing to indicate that defendant's detention was for the purpose of coercing a confession. No circumstances to support a claim of involuntariness appear in this rec-

ord such as appeared in *People* v. *Hamilton, supra,* or *People* v. *Ubbes, supra.*

While this Court does have inherent power to review even if error has not been saved—*People* v. *Dorrikas* (1958), 354 Mich 303—such inherent power is to be exercised only under what appear to be compelling circumstances to avoid a miscarriage of justice or to accord a defendant a fair trial. There is nothing before us in this record to invoke such power. The situation is controlled by holdings of the Court in *People* v. *Barker, supra,* and *People* v. *Lundberg, supra.*

The court of Appeals is reversed and the judgment of conviction entered in the recorder's court of the City of Detroit is affirmed.

DETHMERS, C. J., and KELLY, SOURIS, O'HARA, and BRENNAN, JJ., concurred with ADAMS, J.

BLACK and T. M. KAVANAGH, JJ., concurred in result.