PEOPLE *v.* SHIRK.

OPINION OF THE COURT.

1. CRIMINAL LAW — CONFESSION — CODEFENDANT — ADMISSION — PRESERVING QUESTION.

The issue of denial of the right of confrontation by admission of a codefendant's confession implicating defendant in a murder where defendant was not able to cross-examine codefendant effectively was properly preserved for appeal where counsel for defendant repeatedly requested a cautionary instruction to the jury, his only remedy under the state and Federal rules then extant, and attempted to cross-examine the person confessing, who refused to answer questions.

2. APPEAL AND ERROR—SUPERVISORY CONTROL—FUNDAMENTAL INJUSTICE—PRESERVING QUESTION.

The Supreme Court, in the exercise of supervisory control over litigation, may consider manifest and serious errors to prevent fundamental injustice, even though objection was not made by the appellant at trial.

3. CRIMINAL LAW—CONSTITUTIONAL LAW—EVIDENCE—CONFESSION—CODEFENDANT—ADMISSIBILITY—CONFRONTATION.

The confession of a codefendant which implicates a defendant is not admissible at trial, even with cautionary instructions to the jury that it is evidence only against the person confessing, where the nonconfessing defendant does not have an adequate opportunity for cross-examination of the person

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  21 Am Jur 2d, Criminal Law §§ 333, 338, 343, 344.
[1, 3, 5]  29 Am Jur 2d, Evidence §§ 539–541.
[2]  5 Am Jur 2d, Appeal and Error §§ 545, 548.
[3]  21 Am Jur 2d, Criminal Law §§ 333, 334, 336, 337.
[4]  21 Am Jur 2d, Criminal Law §§ 333–344.
[5]  21 Am Jur 2d, Criminal Law §§ 335–337.
[6]  29 Am Jur 2d, Evidence § 590.
[7]  29 Am Jur 2d, Evidence § 555.

confessing, because this amounts to a denial of the constitutional right of confrontation (US Const, Am 6; Mich Const 1908, art 2, § 19; Mich Const 1963, art 1, § 20).

4. CRIMINAL LAW—CONSTITUTIONAL LAW—CONFRONTATION.

Mere production of witness on the stand does not provide the constitutionally guaranteed right of confrontation where defendant's right to cross-examination is precluded by witness's refusal to answer questions (US Const, Am 6; Mich Const 1908, art 2, § 19; Mich Const 1963, art 1, § 20).

5. CRIMINAL LAW—CONSTITUTIONAL LAW—CONFESSION—CONFRONTATION—RETROACTIVITY.

The rule of constitutional law that a codefendant's confession implicating defendant is not admissible at their joint trial where defendant is not able to cross-examine the confessing codefendant effectively is retroactive and binding on the states (US Const, Am 6; Mich Const 1908, art 2, § 19; Mich Const 1963, art 1, § 20).

6. CRIMINAL LAW—EVIDENCE—CONFESSION—ADMISSION—ERROR.

Error in improperly admitting the confession of a codefendant in a trial for murder was not harmless error beyond a reasonable doubt as to defendant, where the only connection between the defendant and the crime was established by the codefendant's confession, and requires reversal of defendant's conviction.

SEPARATE OPINION.

DETHMERS, KELLY, and BLACK, JJ.

7. CRIMINAL LAW — EVIDENCE — ADMISSIBILITY — PRECEDENT — OVERRULEMENT—RETROACTIVITY.

*A criminal defendant convicted of murder is entitled to a new trial or, if that is impossible, to a judicial acquittal, where a rule of evidence approved by the United States Supreme Court under which his accomplice's confession was properly admitted at his trial was overruled eight years later and the overruling made retroactive by the United States Supreme Court.*

Appeal from Court of Appeals, Division 2, T. G. Kavanagh, P. J., and J. H. Gillis and McGregor, JJ., affirming Oakland, Stanton G. Dondero, J.   Submit-

ted December 8, 1969. (Calendar No. 40, Docket No.
52,291.) Decided March 9, 1970.

14 Mich App 623, reversed.

Richard Harvey Shirk was convicted of first de-
gree murder. Defendant appealed to Court of Ap-
peals. Affirmed. Defendant appealed to Supreme
Court. Remanded to Court of Appeals for further
consideration. Affirmed. Defendant appeals. Re-
versed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Thomas G. Plunkett,*
Prosecuting Attorney, and *Dennis Donohue,* Chief
Appellate Counsel, for the people.

*Booth, Patterson, Hays & Karlstrom,* for defend-
ant on appeal.

T. M. KAVANAGH, J. The focal issue presented by
this appeal is the applicability of *Bruton* v. *United
States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed
2d 476), as made retroactive by *Roberts* v. *Russell*
(1968), 392 US 293 (88 S Ct 1921, 20 L Ed 2d 1100),
in light of our decision in *People* v. *Farmer* (1968),
380 Mich 198.

A joint jury trial of defendants Shirk and Mac-
Kay commenced on May 17, 1960. On May 20, 1960—
after police officers had testified concerning confes-
sions made to them by defendant MacKay, hereafter
discussed—the prosecuting attorney, upon leave
granted, filed an amended information as to defend-
ant MacKay to include the offense of second-degree
murder. Defendant MacKay pleaded guilty to the
included offense, his plea was accepted by the court,
and the trial proceeded as to defendant Shirk alone.

Defendant Shirk claims that the following events in the course of trial effectively deprived him of his constitutional right to confront the witnesses against him and generally denied him a fair trial.

Detective Keenan and Detective Allen testified that defendant MacKay was arrested on January 4, 1960, that at the time of his arrest he had in his possession a .25-caliber gun from which one of the bullets found in the body of the victim was fired, and that they found in the trunk of MacKay's automobile bloodstained clothing which was later identified as belonging to the victim.

Detective Garton of homicide bureau testified that he and his partner interrogated MacKay on January 5, 1960, concerning the bloodstained clothing. MacKay stated (according to Garton's testimony) that the clothing was his and explained that he had received a gunshot wound a couple of months earlier, that he had slept in the car because of some marital dispute, and that while doing so his wound opened and blood got on his clothing.

Detective Marlowe of the hold-up bureau testified that on January 8, 1960, he talked to MacKay regarding information he was going to give concerning the whereabouts of Carlo Vitale (the victim). When asked by the prosecutor to relate their conversation, Shirk's counsel objected, and after a conference in chambers the court instructed the jury that where two or more defendants are charged with the same crime "any statements or admissions, oral or written, made by one of those codefendants not in the presence of the other codefendants, are not admissible in evidence to be used against the other codefendants; but may be considered only in connection with the person who made the statements or the admissions." Detective Marlowe's written notes of his conversation with MacKay were then

offered and received in evidence and read to the jury by Detective Marlowe. In this statement Mac-Kay claimed that Shirk accidentally shot and killed the victim on the night of November 28, 1959. Detective Marlowe further testified that he, his partner, and MacKay went to the vicinity in which MacKay claimed the killing took place, but that they were unsuccessful in locating the body.

Detective Ware testified of conversations wherein MacKay intimated that he was afraid to tell the whole story because of his trepidation of defendant Shirk and because he didn't want to be labeled by his prospective fellow inmates as a "squeaker." The detective testified that MacKay finally asked for Detectives Sobolewski and Ernst to show them where the body was buried. All four proceeded to where MacKay directed them and they found the victim's body.

The following morning MacKay, according to Detective Ware, was confronted with the fact that the autopsy had shown the victim to have been shot more than once. Detective Ware testified as follows:

"This is what he [MacKay] said: He gave us the same original story of driving out around Fourteen Mile and Mound Road with Vitale and with Shirk along; that Shirk was handing a .25 automatic back to Vitale, who was in the back seat; the gun accidentally discharged while Shirk was handing him back; wounded Vitale. He said he became frightened. He got out of the car, became excited, and that Shirk slapped him around. He says, 'I was shook up and Shirk slapped me around and said, "Come on, quieten down. We've go to do something about this." '

"He said he was told by Shirk that they couldn't possibly take Vitale to get any aid, because they would both be in serious trouble. So, Shirk said, 'We have to'—to use the words—'finish him off.'

"He said, 'Shirk told me to shoot him twice and that he, Shirk, would shoot him twice.'

"So that he turned around and fired twice at Vitale while the car was stopped in this location after they stopped the car with the first accidental shot.

"He said then Shirk got back in the car and started to drive, as he could not drive, he was too excited. He said they drove a short way. Shirk turned around with his gun and fired a shot into Vitale. He said Shirk drove another distance and turned around and grabbed Vitale by the hair of his head and turned around and fired a shot into the back of his head."

At the conclusion of Detective Ware's testimony, MacKay's attorney requested a recess. When the court reconvened, and in the absence of the jury, the prosecutor filed an amended information adding a second count, to which defendant MacKay pleaded guilty. The court, at the conclusion of these proceedings, then informed the jury that MacKay had just pleaded guilty to the second charge, that his plea had been accepted by the court, and that the trial would continue only as to defendant Shirk.

The prosecution, through an expert witness in hematology, introduced proofs that the blood type found on the clothing in MacKay's car trunk differed from MacKay's blood type and was the same type as the victim's. The prosecution's ballistic expert witness testified that one of the bullets removed from the corpse was fired from the gun found on MacKay's person at the time of his arrest.

Upon the conclusion of the people's case, and after defendant's opening statement, defendant Shirk took the stand in his own defense. He testified that he and MacKay took the victim to Chattanooga, Tennessee, and that this was the last time he saw the victim. He denied any knowledge concerning the circumstances of the victim's death.

Subsequently, the prosecution called MacKay as a rebuttal witness, and his testimony is as follows:

"*Q.* (*by Mr. Barry, assistant prosecutor*): You were a codefendant in this case?

"*A.* Yes.

\*    \*    \*

*Q.* You have pleaded guilty in this court to the charge of second-degree murder in connection with this matter?

"*A.* I have.

"*Q.* Do you know the respondent Richard MacKay or—Richard Shirk, rather?

"*A.* Yes.

"*Q.* Are you acquainted with the facts surrounding the shooting of Carlo Vitale?

"*A.* I am not going to answer.

"*Q.* Were you present when Carlo Vitale was killed?

"*A.* I am not going to answer any questions, Mr. Barry.

"*Q.* You are here under subpoena of this court?

"*A.* Yes.

"*Q.* Would you tell this court and the jury why you refuse to answer questions concerning this matter?

"*A.* Because I am afraid of Dick, that is why.

"*Q.* Of Dick Shirk?

"*A.* Yes.

"*Q.* In what way?

"*A.* Just afraid of him, that's all. I don't want to be wrong about anything. I am not going to answer any questions.

"*Mr. Barry:* Your witness.

"*Q.* (*by Mr. Bedrosian, attorney for defendant*): Were you told to say that now, sir?

"*A.* Was I told to say that? No. What I was told—I was—that is what I told I was going to say.

"*Q.* You told the police that Carlo Vitale was killed on November 28?

"*A.* I am not going to answer any questions.

"*Q.* Was Carlo Vitale killed on November 28?

"*A.* I am not answering any questions, Mr. Bedrosian.

"*Q.* Is your wife a nurse?

"*A.* I told you, I have nothing to say. I am not answering any questions.

"*Q.* Did you ever attempt to kill Vince Venezia?

"*A.* I am not answering any questions.

"*Q.* Did you ever shoot Bob Hicks through the hand?

"*A.* I am not answering any questions.

"*Mr. Bedrosian:* No further questions.

"*Mr. Barry:* That is all."

The mutually agreed-upon issues raised on appeal are:

(1) Was the accused denied his right to be confronted by the witnesses against him as guaranteed by § 19 of article 2 of the Michigan Constitution of 1908[1] and by the Sixth Amendment to the Constitution of the United States?

(2) Was the defendant denied the "fair trial" which the Constitutions afford to each person accused of crime?

The threshold question to be resolved in this appeal is whether defendant properly raised the first issue above which relates to a codefendant's extrajudicial statements and preserved it for appellate review. The people contend that this issue was never properly raised for appellate review, relying almost exclusively upon the authority of *People* v. *Farmer* (1968), 380 Mich 198.

In *Farmer* this Court held (p 205):

"While the rule announced in *Walker* (*People* v. *Walker* [On Rehearing, 1965], 374 Mich 331) was made retroactive, it does not follow that in every trial prior to *Walker* in which a confession was ad-

---

[1] For current provision, see Const 1963, art 1, § 20.

mitted in evidence a defendant is now automatically entitled to a *Walker*-type hearing. See, for example, *People* v. *Fordyce* (1966), 378 Mich 208.

"Under normal appellate procedures, since defendant was represented by counsel at all stages of the proceeding in which he was entitled to such representation *and no claim of inadmissibility was raised,* there would be no assignment of error for an appellate court to review. This would end our consideration of the case." (Emphasis supplied.)

The facts of that case, as repeatedly pointed out in subdivision I of that opinion, clearly indicate that no objection was made either to the testimony of the people's witnesses or to the admission of defendant's signed statement or to the submission of the voluntariness issue to the jury under unobjected-to instructions. An assiduous reading of the facts in *Farmer* indisputably supports the conclusion of the Court stated at page 204:

*"The issue of involuntariness of defendant's statements and confession was not raised in 1958 either prior to trial or upon trial. If it had been, the recorder's court judge would have excluded the confession upon a determination of involuntariness or, in case of doubt, the issue of voluntariness would have been presented to the jury for its determination. People* v. *Barker* (1886), 60 Mich 277; *People* v. *Prestidge* (1914), 182 Mich 80; *People* v. *Burlingame* (1932), 257 Mich 252; *People* v. *Louzon* (1953), 338 Mich 146. Though defendant was represented by retained counsel, because no objections were made, neither procedure was followed. It must be concluded that either there was no issue of involuntariness or that such issue was waived as a matter of trial strategy."[2] (Emphasis supplied.)

---

[2] It should be noted in this context that the procedural machinery for testing the voluntariness of a confession, irrespective of whether it be by judge or by jury, has been a well-established and traditional safeguard of the criminal law of this state and that any

The facts in the instant case, however, differ radically from those in *Farmer, supra.* The record in this case discloses that when the people in the first instance attempted to introduce the statement of codefendant MacKay, counsel for defendant Shirk (and notably not counsel for defendant MacKay) raised the following objection:

"*Q.* (*by Mr. Barry, assistant prosecutor*): Did you go to the county jail the next morning?

"*A.* (*by Detective Marlowe*): Yes, sir, I did.

"*Q.* Did you talk to MacKay?

"*A.* Yes, sir.

"*Q.* What was the conversation?

"*Mr. Bedrosian:* Now, your Honor, at this time, I would like the court to instruct the jury that any confession or statement made by MacKay—

"*Mr. Barry:* I will object. I will object to this right off the bat. If there are instructions to be

---

properly raised objection would have immediately started a procedural inquiry as to the voluntariness of the proffered confession or statement. See 1 Cooley, Constitutional Limitations (8th ed), pp 651–658. On the other hand, the right of confrontation, while equally well established, was usually passed upon by the appellate courts as an evidentiary matter dealing with the hearsay rule and its exceptions.

As stated by the United States Supreme Court in *Salinger* v. *United States* (1926), 272 US 542 (47 S Ct 173, 71 L Ed 398):

"The right of confrontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions. The purpose of that provision, this Court often has said, is to continue and preserve that right, and not to broaden it or disturb the exceptions. *Mattox* v. *United States* (1895), 156 US 237, 243 (15 S Ct 337, 39 L Ed 409); *Robertson* v. *Baldwin* (1897), 165 US 275, 281–282 (17 S Ct 326, 41 L Ed 715); *Kirby* v. *United States* (1899), 174 US 47, 61 (19 S Ct 574, 43 L Ed 890); *Dowdell* v. *United States* (1911), 221 US 325, 330 (31 S Ct 590, 55 L Ed 753). The present contention attributes to the right a much broader scope than it had at common law, and could not be sustained without departing from the construction put on the constitutional provision in the cases just cited." (p 548.)

For this Court's view on this subject see, *e.g., People* v. *Thomas* (1960), 359 Mich 251; *People* v. *Pickett* (1954), 339 Mich 294, 305; *People* v. *Lewis* (1940), 294 Mich 684, 687. Not until *Bruton,* discussed *infra,* was this typically evidentiary problem answered on strictly constitutional grounds.

given to the jury, they will be given by the court
in the charge to the jury.

"*Mr. Bedrosian:* I think I am entitled to instruction.

"*Mr. Barry:* If the court please, this is improper.

"*Mr. Bedrosian:* That is the law, that at the time
of the statement—

"*Mr. Barry:* Before Mr. Bedrosian says anything
further, if he has such a motion to make to the court,
I will ask that we retire to chambers.

"*The Court:* All right, we will do it right now.
We will retire to chambers."

When court reconvened, MacKay's counsel attempt-
ed through cross-examination of the people's witness
to test the voluntariness of MacKay's statement and
moved that the statement be taken under objection:

"*Mr. Pratt (attorney for MacKay)*: If it please
the court, as the court has recognized, I am attempt-
ing to inquire into and determine whether or not the
statement given, that he is to testify to shortly, was
voluntary. We have not had the opportunity, of
course, to interrogate all of the other police officers
whose names I just mentioned. Therefore, I should
like to request of the court and move that the state-
ment be taken under my objection; that if subse-
quent findings determine that the statement was not
voluntarily given, that it be stricken from the record
and the jury be admonished to disregard it.

"*The Court:* Very well."

At this juncture defendant's counsel again timely
moved to preserve the defendant's right to at least
a cautionary instruction:

"*Mr. Bedrosian:* Your Honor, I presume at this
point we are now going into the statement; is that
correct?

"*The Court:* I was waiting to hear the next ques-
tion.

"*Mr. Bedrosian:* Are we going into the statement?

"*Mr. Barry:* Yes.

"*Mr. Bedrosian:* At this time, your Honor, I repeat my request that the jury be instructed that any statements made by defendant MacKay are not to be considered as binding or as evidence against the defendant Shirk; that the statements are to be used only for what they are worth as to the defendant MacKay.

"*The Court:* Ladies and gentlemen, it is my understanding that the rule of law is this: That where we have two or more defendants charged with the same crime, that any statements or admissions, oral or written, made by one of those codefendants not in the presence of the other codefendants, are not admissible in evidence to be used against the other codefendants; but may be considered only in connection with the person who made the statements or the admissions.

"Now, I don't know what this testimony is going to develop. But if it is shown here that the defendant MacKay made any such statements or admissions to this witness or any other out of the presence of the defendant Shirk, then, those statements and admissions cannot be binding as to the defendant Shirk and cannot be considered by you in considering the guilt or the innocence of the defendant Shirk.

"Anything further on this?

"*Mr. Bedrosian:* No, your Honor.

"*The Court:* Very well.

"Now, you may proceed, Mr. Barry."

When the people sought to elicit codefendant MacKay's confession from still another witness, defendant's counsel again objected:

"*Mr. Bedrosian:* Now, again, your Honor, I ask the court to instruct the jury that any admissions or statements made by the defendant MacKay not in the presence of the defendant Richard Shirk

should not be binding or taken as binding or as evidence against the defendant Richard Shirk.

"*The Court:* I thought I gave that instruction very clearly and thoroughly.

"*Mr. Bedrosian:* I realize that, but at this time I call the court's attention to it.

"*The Court:* I don't feel that I must give that instruction every time a witness takes the stand. I think this jury understands the statement of law that I gave them as to the admissions by one codefendant in connection with the other and that, of course, if those statements are made out of the presence of the other codefendant, they are not admissible as being binding against that other codefendant.

"*Mr. Bedrosian:* Your Honor, I understand that. But, as I understand the law, when there is one statement, I am only entitled to the one instruction. But when there are more than one statement—of course, I could be wrong—when there are more than one statement made by one codefendant against the other, when a statement or new statements appear before the court or jury, I am entitled to that instruction. Of course, I could be wrong.

"*Mr. Barry:* If the court please, we will stipulate that the ruling of the court is a continuing ruling and applies each and every occasion when it is applicable.

"*The Court:* I assume that will be included in the final charge, also.

"*Mr. Bedrosian:* Yes, your Honor."

Even the most cursory perusal of the record in this case will reveal a commendably vigilant and persistent advocacy of all the then-existing substantive and procedural rights and safeguards afforded by the laws of our state and by the laws of the United States. We recognize that defense counsel did not expressly object to the "legal validity" of, for example, *People* v. *Roxborough* (1943), 307

Mich 575, 585–588, or *Delli Paoli* v. *United States* (1957), 352 US 232 (77 S Ct 294, 1 L Ed 2d 278). However, unlike the barren record presented in *Farmer, supra,* this record is replete with adversary efforts raising the *substantive issue.* To require defense counsel to mouth a collocation of words which could be formally labeled as an objection to the extant state and Federal rules, as urged upon us by the people, would exalt form over substance.

We must remember that defense counsel was engaged in an adversary trial of a man charged with first-degree murder and not some academic debate concerning the constitutionality of the *Delli Paoli* decision, *supra,* handed down just four years previous.[3] To require defense counsel to presciently advocate a theory[4] which would crystalize in Federal constitutional law some eight years subsequent to trial can be viewed as nothing more than legalistic sophistry.

The unassailable facts are that the *substantive* issue was raised at trial, expressly passed upon by the Court of Appeals in the first instance ([1968], 10 Mich App 121), remanded by this Court ([1968], 381 Mich 764) explicitly upon the basis of *Bruton* v.

---

[3] The practical adverse effects of such a course of trial strategy was well illustrated by the congruent factual situation presented in *Douglas* v. *Alabama* (1965), 380 US 415 (85 S Ct 1074, 13 L Ed 2d 934). In that case the United States Supreme Court rejected the technical position of the Alabama Court of Appeals, which affirmed Douglas' conviction because trial counsel had "stopped objecting" and by doing so concluded that "the failure to object was waiver." The Court held at p 422:

"*No legitimate state interest would have been served by requiring repetition of a patently futile objection, already thrice rejected, in a situation in which repeated objection might well affront the court or prejudice the jury beyond repair.*" (Emphasis supplied.)

[4] Parenthetically, we point out in further support of the threshold question discussed above that the motivating force behind the Court's constitutional about-face in *Bruton,* discussed *infra,* was its decision in *Jackson* v. *Denno* (1964), 378 US 368 (84 S Ct 1774, 12 L Ed 2d 908), which was not decided until four years after the trial of the instant case.

*United States, supra,* and decided again by the Court of Appeals exclusively upon the remanded issue ([1968], 14 Mich App 623). These facts distinguish this case from what we held in *Farmer, supra,* and we conclude that the issue was properly raised and preserved for appeal.

We pause to add at this juncture, that, even if defense counsel had not properly objected, the constitutional import of the issue as bearing upon a fundamentally fair determination of guilt or innocence[5] necessitates review under the rule expressed in *People* v. *Dorrikas* (1958), 354 Mich 303, at p 316:

"Ordinarily where no timely objection was made to the introduction of such testimony and no request to charge was made, this Court would not examine the points relied upon for reversal, and except under unusual circumstances we have no disposition to relax this rule. *Nevertheless, as in a number of previous cases, this Court, in the exercise of supervisory control over all litigation, has often asserted the right to consider manifest and serious errors although objection was not made by the party who appeals. The inherent power of this Court to prevent fundamental injustice is not limited by what appellant is entitled to as a matter of right. People* v. *Steeneck* (1929), 247 Mich 583; *People* v. *Holmes* (1940), 292 Mich 212; *People* v. *Kelsey* (1942), 303 Mich 715." (Emphasis supplied.)

---

[5] The rationale moving the United States Supreme Court to retroactively apply the rule expressed in *Bruton, supra,* was lucidly stated by that Court in its subsequent decision of *Roberts* v. *Russell, supra,* at page 294:

"Despite the cautionary instruction, the admission of a defendant's confession which implicates a codefendant results in such a 'serious flaw.' The retroactivity of the holding in *Bruton* is therefore required; the error 'went to the basis of fair hearing and trial *because the procedural apparatus never assured the (petitioner) a fair determination'* of his guilt or innocence. *Linkletter* v. *Walker* (1965) 381 US 618, 639, n 20 (85 S Ct 1731, 14 L Ed 2d 601), at 639, n 20." (Emphasis supplied.)

See, also, *State* v. *Steinhauer* (Fla, 1968), 216 So 2d 214.

Beyond cavil, the issue is properly before this Court and we are oath-bound to pass upon it.

Since the trial of this case, the United States Supreme Court has decided *Bruton* v. *United States, supra,* stating at page 126:

"We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' (Bruton's codefendant) confession in this joint trial violated petitioner's right of cross-examination secured by the confrontation clause of the Sixth Amendment. We therefore overrule *Delli Paoli* and reverse."

The holding in *Bruton* has been explicitly declared by that Court to be retroactive and binding upon the states. See *Roberts* v. *Russell, supra,* p 294.

Having decisionally shown the inapplicability of *Farmer, supra,* and the binding application of *Bruton* to the facts of this case,[6] the only remaining consideration is whether the error complained of should be considered as harmless error. See *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284).

In *Harrington,* the Court, reviewing the peculiar facts of that case, concluded at pp 253, 254:

---

[6] The people's position is that codefendant MacKay, after his plea of guilty to second-degree murder had been accepted, was placed on the witness stand and therefore the opportunity for confrontation, irrespective of his amenability to cross-examination, was provided. This position is patently inadequate. We emphasize that the mere production of a witness on the stand cannot satisfy the true meaning of "confrontation" in its constitutionally intended sense. See, *e.g., People* v. *Perrin* (1923), 223 Mich 132, 135, 136. The primary purpose of confrontation is to provide an adequate opportunity for cross-examination. See *Pointer* v. *Texas* (1965), 380 US 400 (85 S Ct 1065, 13 L Ed 2d 923), and cases cited therein. See, also, 5 Wigmore, Evidence (3d ed), § 1395, pp 122–127; 1 Cooley, Constitutional Limitations (8th ed), pp 662–666, and authorities cited therein.

*"But we conclude that on these special facts the lack of opportunity to cross-examine Cooper and Bosby (codefendants) constituted harmless error under the rule of Chapman* (Chapman v. California [1967], 386 US 18 [87 S Ct 824, 17 L Ed 2d 705].)

"Rhone [codefendant], *whom Harrington's counsel cross-examined,* placed him in the store with a gun at the time of the murder. *Harrington himself agreed he was there.* Others testified he had a gun and was an active participant. Cooper and Bosby did not put a gun in his hands when he denied it. They did place him at the scene of the crime. But others, *including Harrington himself,* did the same. Their evidence, supplied through their confessions, was of course cumulative. *But apart from them the case against Harrington was so overwhelming that we conclude that this violation of Bruton was harmless beyond a reasonable doubt,* unless we adopt the minority view in *Chapman* (386 US, at 42–45) that a departure from constitutional procedures should result in an automatic reversal, no matter the weight of the evidence." (Emphasis supplied.)

In the instant case, defendant throughout the course of his trial and on the witness stand denied any knowledge of the alleged homicide. The only nexus between defendant and the alleged homicide is provided solely by MacKay's confession. The evidence presented at trial, *e.g.,* the murder weapon *found on MacKay's person* at the time of his arrest, the bloodstained clothing *found in the trunk of MacKay's car,* etc., while sufficient to sustain MacKay's conviction, is simply inadequate for a finding of guilt as to defendant, let alone overwhelming evidence of his guilt. We are unable to declare that the error complained of is harmless beyond a reasonable doubt as defined by *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705).

The people, with characteristic honesty and intellectual candor, conceded in their oral argument

Opinion by BLACK, J.

before this Court that if the *Bruton* error exists, the error would *not* be harmless error. We agree.

The decision of the Court of Appeals is reversed and the cause remanded for a new trial.

T. E. BRENNAN, C. J., and KELLY, and ADAMS, JJ., concurred with T. M. KAVANAGH, J.

BLACK, J. (*concurring in reversal*). For the second time this Court reviews the 1960 conviction of a confessed killer. To quote then dissenting Judge T. G. KAVANAGH, formerly of the Court of Appeals and now a distinguished member of this Court (*People* v. *Shirk* [1968], 10 Mich App 121, 127):

"Richard Shirk and Gerald MacKay killed Carlo Vitale. Gerald MacKay confessed the murder to the police investigating it. Richard Shirk, in an unusual effort to obtain a new trial after he had been convicted and sentenced to life in prison, admitted it in a letter to the trial judge.

"While his admission was in direct contradiction to his sworn testimony at trial, a fact which the trial judge used as the basis for denying the request, a reading of the testimony of the witnesses touching upon the interstate flight of the defendants and the deceased, leads to the inescapable conclusion that at long last, Richard Shirk told the truth when he admitted the murder."

Upon review of the decision just cited, *Bruton* and *Roberts* having just come to release,* we ordered July 24, 1968 (381 Mich 764, 765) that the defendant's said conviction receive further consid-

---

* *Bruton* v. *United States,* May 20, 1968, 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476); *Roberts* v. *Russell,* June 10, 1968, 392 US 293 (88 S Ct 1921, 20 L Ed 2d 1100). The first overruled *Paoli* v. *United States* (1957), 352 US 232 (77 S Ct 294, 1 L Ed 2d 278). The second, 21 days later, rendered such overrulement wholly retroactive.

eration in the light of that pair of supreme judicial determinations. The Court of Appeals proceeded accordingly. By majority vote of the assigned panel of that Court, Shirk's previously affirmed conviction was reaffirmed (*People* v. *Shirk* [1968], 14 Mich App 623). Leave to review was granted February 20, 1969 (381 Mich 804).

The facts and history of the charge lodged against Shirk appear fully in the two cited opinions of Division 2 and require no rehash now. The real question is whether the formerly applicable rule of evidence, standing as that rule indubitably did—by the eminence of *Paoli*—when Shirk was tried and convicted back in 1960, must be disregarded *nunc pro tunc* in favor of the 360-degree circumgyration ordered eight years later by *Bruton* and *Roberts,* so as to require that Shirk have a new trial or, if that has become impossible, that the circuit court must by recording a *nolle prosequi* acquit him of this callously calculated assassination.

Not by the desirable and supposedly sensible judgment of this Court, but solely on account of the oathbound duty of judges of the Courts of the States to apply the 1968 rule of *Bruton* and *Roberts,* retroactively as if there was never a lawful rule of *Paoli,* our lay-unbelievable answer must be "Yes."

The Supreme Court of the United States in 1968 informed us that its *Paoli* rule, faithfully applied as that rule was to this 1960 trial for murder, not only was wrong but was so wrong as to require the wholly retroactive overrulement thereof. This means that an assiduously careful prosecutor, a correspondingly careful and vigorous defense counsel, and an altogether able and since-deceased judge presiding over this 1960 trial, somehow should have foreseen that the post-*Paoli* departure from the United States Supreme Court of several justices

and the confirmation of their successors, occurring over the intervening years, would mean not only the overrulement of *Paoli* but the ordained retroactivity of such overrulement.

Yes, the prosecutor, the defense counsel and the circuit judge are all guilty of second-guessed reversible error. They erred in taking the United States Supreme Court's solemn *Paoli* word. No one of them thought up, or foresaw, or saved for review, any idea that all confessional admissions of co-defendant MacKay, even though rightfully admissible at the time under *Paoli,* would be held inadmissible eight years later with counter-calendared effect.

The reason for reversal here is that their error was of such magnitude as to require no raising and saving of its point for review. To be sure, it was a "constitutional error." Did not the United States Supreme Court conclude the penultimate paragraph of its opinion of *Roberts* this way (p 295):

"And even if the impact of retroactivity may be significant, the constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined"?

Convinced that the Supreme Court's temporary and ever-changing majority was so patently wrong both in *Bruton* and *Roberts,* I am led to wonder in print why more of us, no matter the exalted plane of our position in the judicial process, do not on occasion walk alone into some quiet field or forest, there to gaze aloft at that mentally visible eagle of death or disability that is poised over every mortal man, just to meditate the fact that judicial tenure is fleeting, and then to realize that divisively contradictory opinions of courts of final resort (like *Bruton* and *Roberts* and indeed too many of ours) are becoming more and more like that "restricted

railroad ticket, good for this day and train only,"
of which Mr. Justice Roberts wrote so forcefully
when he opposed overrulement of then similarly re-
cent *Grovey* v. *Townsend* (1935), 295 US 45 (55 S Ct
622, 79 L Ed 1292, 97 ALR 680). The Justice wrote
such opposition for *Smith* v. *Alwright* (1944), 321
US 649, 669, 670 (64 S Ct 757, 88 L Ed 987). The
final paragraph of his dissent is just as levelheaded
today as when written (p 670):

"It is regrettable that in an era marked by doubt
and confusion, an era whose greatest need is stead-
fastness of thought and purpose, this court, which
has been looked to as exhibiting consistency in ad-
judication, and a steadiness which would hold the
balance even in the face of temporary ebbs and flows
of opinion, should now itself become the breeder of
fresh doubt and confusion in the public mind as to
the stability of our institutions."

With more than demurring reluctance, and only
on account of sworn obligation so to do, I concur in
reversal for new trial or, failing that, for judicial
acquittal of a confessed murderer.

DETHMERS and KELLY, JJ., concurred with BLACK,
J.

T. G. KAVANAGH, J., did not sit in this case.